(88 South. 77)

No. 22830.

PIERSON v. TIMES-PICAYUNE PUB. CO.

(Feb. 28, 1921.)

(Syllabus by the Court.)

1. Constitutional law ⬳90—Libel and slander ⬳49—Provision as to liberty of speech and of, the press does not interfere with statutory recovery for libel.

The constitutional provision which secures liberty of speech and the freedom of the press in no wise interferes with the operation of the statute law which entitles one who has been injured by a libelous publication to recover damages therefor; and the publisher of a newspaper has no greater privilege than an ordinary person to publish false and defamatory statements.

2. Libel and slander ⬳30—Truth or falsity of statement made depends on its connection and purpose.

Whether the statement of a fact be true or false may depend upon the connection in and purpose for which it is made.

3. Asylums ⬳3—General Assembly alone may order investigation of state insane asylum.

Where a state insane asylum, the authority to govern which is vested in a board of administrators, is thought to require investigation, the General Assembly is the proper authority to order it, and no individual, or corporation, be it a publishing company or other, is competent to exercise that function, save by the authority of, and in the manner prescribed by, the board; nor does the law vest in the Governor the power to control the board with respect to its regulations on that subject, though the members may be subject to removal as the law may prescribe.

(Additional Syllabus by Editorial Staff.)

4. Libel and slander ⬳10(1)—Charges against superintendent of state insane asylum held libelous.

In a libel suit by the superintendent of a state insane asylum against a newspaper which made charges of unfitness, and mismanagement, such charges held libelous.

O'Niell and Provosty, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Dr. Clarence Pierson against the Times-Picayune Publishing Company for libel. Judgment for plaintiff, and defendant appeals. Amended and affirmed.

Benjamin T. Waldo and Lemle & Lemle, all of New Orleans, for appellant.

R. F. Walker, of Clinton, and Dart, Kernan & Dart, of New Orleans, for appellee.

On the Exception.

MONROE, C. J. Defendant prosecutes this appeal from a judgment awarding plain-

tiff $7,500 as damages sustained by reason of alleged libelous publications appearing in the Times-Picayune, a daily newspaper of which defendant is publisher. It appears that the case was twice tried before juries; the first trial having been entered upon on April 2, and continued from day to day until May 11, 1917, when, the jury, being unable to agree, was discharged. The impaneling of the jury for the second trial began on May 28, and was completed on June 1, 1917, when the pleadings were read and the case continued to June 6. On June 5, in view of the fact that the summer vacation was to begin on July 1 and to extend to October 15, the counsel representing the litigants respectively, entered into the following agreement (omitting title of case and signatures) to wit:

"In the above entitled and numbered cause, leave of court having been had, it is hereby agreed between counsel for all parties that this case shall be continued during vacation, on the 1st day of July, 1917, and shall be tried and disposed of, and the judgment rendered and signed, all as in term time, and if there be any appeal the same may be taken by motion, as well as by petition, within the delays and in the manner prescribed, as if in term time, and that every day except Saturdays, Sundays, and legal holidays shall be counted and considered as a judicial day."

The case was again put on trial on June 6, and so continued until July 4, when the second mistrial was entered, and counsel for plaintiff then moved that the matter be taken under consideration by the judge, agreeably to the provisions of Act 51 of 1908, section 1 of which declares:

"That in any case where a jury has been prayed for by either party, and where the case has been tried twice by a jury without a verdict being reached, no further trial by jury shall be had, but the case shall be tried by the judge alone, the same as if no jury had been prayed for."

The motion having been fixed for argument on July 6, defendant on that day interposed certain objections which were overruled, and the judge, considering the Act of 1908 and the agreement of counsel, ordered that the case be fixed for trial before him on July 16, at which time a bill of exception, containing the following objections, was presented for signature, and signed, to wit, that Act 51 of 1908 "is unconstitutional, in that it is incomplete and defective in its title"; that if it be constitutional it does not authorize the trial of the case or the rendition of any judgment therein during the vacation of the court, i. e., between June 30 and October 15; that the agreement of counsel was intended to apply solely to the jury trial which ended in the mistrial on July 4; that, even if it were susceptible of the interpretation that it was intended to apply to a subsequent trial, defendant has a right to recede from it, and did, in effect, recede, by objecting to going into such subsequent trial; "that there is no law which authorizes the court to take up the trial of a cause where a jury has failed to agree and continue the said cause by rendering judgment therein."

On July 16 also, counsel, without further objection upon either side, offered all the evidence which they respectively had offered upon the previous trials, and it was agreed that if any evidence had been offered and not filed the counsel by whom it had been offered should have the right to file it, and plaintiff offered some evidence in rebuttal, to which the only objection was that it was irrelevant and immaterial, whereupon the testimony was closed, the case was argued on the question of the amount of damages, and the judgment was rendered.

The title of Act 51 of 1908, reads "An act in reference to trial by jury in civil cases." The act contains three sections; the first, is hereinabove quoted; the second declares that no judge shall set aside the verdict of a jury more than twice, and that, should there be

three jury trials, the judge shall render judgment on the third verdict without entertaining a motion for a new trial; and the third declares that the act shall not affect pending cases. The substance of the act is therefore strictly germane to the title; and, as has been said with reference to an act entitled "An act relative to finances of the state," we are not prepared to say that the title does not sufficiently express its object. National Bank v. Mahan, 21 La. Ann. 752. See, also, Board v. Fowler, 50 La. Ann. 1358 et seq., 24 South. 809; Compagnie Francaise, etc., v. State Board, 51 La. Ann. 657, 25 South. 591, 56 L. R. A. 795, 72 Am. St. Rep. 458; Thornhill v. Wear, 131 La. 479, 59 South. 909. In the case last cited, it is said (131 La. Ann. 483, 484, 59 South. 910):

"If the title does not mislead, or if it be such as not to take one by surprise, it may be good, although it may not be as ample as it might be."

As to the agreement, we find it impossible to conceive how its application can be confined to the jury trial that was pending when it was entered into, since it declares, in terms:

"That this case (not the trial of the case) shall be continued during vacation, * * * and shall be tried *and disposed of and the judgment rendered and signed, all as in term time,* and, *if there be any appeal, the same may be taken * * * as if in term time,*" etc. (Italics by the writer.)

As there had just been one mistrial, it is to be presumed that the possibility of another was within the contemplation of the parties, and they knew that a mistrial does not dispose of a case; also that without a final judgment there could be no appeal; and, further, that, if they desired to confine the application of the agreement to the then pending jury trial, the English language contains words in which that idea could readily be expressed. That the defendant could recede from the agreement, as expressed by its counsel, we very much doubt, but we do not understand that counsel are urging that claim, and we need express no opinion upon it. We conclude that the objections reserved in the bill were properly overruled.

On the Merits.

The publications alleged to be libelous relate to the methods employed and to a variety of incidents and conditions which are said to have occurred and been found existing in the insane asylum at Jackson in this state, and which, either in terms or by implication, are attributed to plaintiff, and constitute the bases of certain charges and insinuations alleged by him to be false, malicious, and highly injurious.

The defense is an affirmance of the truth of the statements contained in the publications and the assertion that they were privileged, which defense is sought to be strengthened by further charges set forth in paragraph 8 of the answer. That paragraph was ordered to be stricken out, but the trial judge, reconsidering his ruling, to some extent, admitted evidence offered on behalf of defendant in support of its allegations, and plaintiff, under protest, offered evidence in rebuttal. Defendant assigns error to the following effect, to wit:

(1) Plaintiff, having admitted that the articles complained of are based on facts, the lower court erred in decreeing that they are libelous; (2) erred in holding that a newspaper is neither privileged to criticize the acts of a public man nor the conditions existing in a public institution; (3) in holding that the truth or justification of the matters charged as defamatory was no defense; (4) in holding that the published articles were libelous, as the comment and criticism therein contained are not upon plaintiff's personal character but upon events which occurred and upon existing conditions in a public institution; (5) in awarding excessive damages.

The admission referred to was intended, as we think, to be applied only to certain of the facts, and, as qualified, meant no more than that, as stated in the published articles, they are but half truths, conveying false impressions. We find no error in the ruling complained of.

The first of the articles in question was intended to be published on Christmas Day, 1915; but its publication was delayed by circumstances to which we shall refer hereafter, and it appeared in the paper of Sunday, February 13, 1915, announced by the leading editorial of that date, which reads as follows:

"The Jackson Insane Asylum.

"The Times-Picayune this morning begins publication of the results of an investigation of the Louisiana Hospital for the Insane at Jackson. By way of editorial preface, we wish to state that the investigation at Jackson was only part of a general inquiry into the conditions of the State Insane Asylums in three Southern Commonwealths—Louisiana, Mississippi and Alabama. The survey was inaugurated, not with any purpose or desire to dig up sensations or scandal, but, with the idea of giving the public a clear idea of conditions prevailing in these institutions and their needs in the way of legislation and financial aid.

"The investigation has been under way for some months. Our representatives were instructed to make it thorough and fair. Their work has been facilitated by the state authorities and by the hospital staffs of every institution visited, save one. The official co-operation has been complete and cordial at every institution, save one. Books and vouchers have been readily opened to inspection upon request, access has been cheerfully granted to the various boards, requests for interviews promptly complied with, at every asylum included in the survey—save one.

"The exception to this general and gratifying rule has been furnished, we regret to say, by a Louisiana asylum—the state hospital at Jackson. In that institution, the inquiry was delayed and balked in every possible way by the superintendent, Dr. Pierson. It was persisted in notwithstanding the obstacles placed in the way. The results go a great way, in our judgment, towards explaining the opposition interposed at every step of the inquiry.

"We shall not attempt to publish all the facts and information secured. There are sensational and harrowing details whose suppression is desirable if the changes and reforms which seem to us necessary can be obtained without their publication. But the Times-Picayune is convinced that the public interest and the welfare of the unfortunates who are inmates of the Jackson asylum require a change in the management of that institution. To put it more plainly, we are convinced that Dr. Clarence Pierson is unfit for the post which he occupies. In the series of articles whose publication begins this morning, we shall present facts and reasons which have lead us to that conviction.

"Neither the general survey of the Southern asylums nor the exposition begun this morning has been inspired by political motives or personal animus. We regret the necessity of an exposure which must prove painful, and have sought to avoid it. But our effort to bring about the required changes quietly and without publicity has been defeated. We are therefore presenting these matters as a public duty, believing that public opinion, when informed about conditions and practices at the Jackson asylum, will agree with us regarding the situation there and see to it that the needed reforms are brought about."

The article thus announced occupies the entire width of the first two columns, for about one-third of their length, on the front page of the paper, and consists, in part, of the following "scare" heading and a prologue, or preface, in editorial type and spacing, to wit:

"Pierson Opposition
To Asylum Inquiry
Arouses Suspicion.

"Superintendent of State Institution for Insane Tries to Block Investigation.

"The Times-Picayune Will Give Good and Sufficient Reasons for Believing Him Unfit to Continue in the Position He Now Occupies —Easy Explanations Fail to Cover Official Shortcomings.

"By W. J. Leppert.

"Early in November, the Times-Picayune began an investigation into conditions affecting

the insane and feeble minded wards of Louisiana. Everything, at the outset, indicated that the inquiry would be completed by Christmas, and that adequate remedies to correct ascertained evils would be applied or determined upon for recommendation.

"Before it had gone very far, the investigation was balked by an unexpected, determined and persistent opposition, initiated by a highly honored state officer.

"The investigation by the Times-Picayune covered hospitals for the insane in Louisiana, Mississippi and Alabama. In but one institution, in these three states, was a free and full inquiry interfered with. That solitary exception was the East Louisiana Hospital for the Insane at Jackson, Louisiana.

"The sole institutional superintendent who fought an inquiry was Dr. Clarence Pierson, who signs himself 'B. S. M. D.'

"So peculiarly was this opposition in contrast to the courteous treatment extended to the Times-Picayune in the other institutions and so bitterly fought was the inquiry that suspicion was engendered that something akin to 'rottenness in Denmark' existed in the East Feliciana Parish Hospital.

"The methods practiced by Dr. Pierson to arrest the inquiry, and to discredit the Times-Picayune and its representative, kindled into flame the suspicion that great wrong was being done the state and her unfortunate wards.

"And just in proportion as Dr. Pierson opposed obstacle after obstacle to the investigation the determination of the Times-Picayune was strengthened to ascertain the truth and lay bare any institutional rottenness it found."

The article then runs on through about a fourth of the first column of solid matter, on the front page, and, say, a column and a half on a subsequent page, and thereafter the other articles appear on the front and subsequent pages of the papers of February 14, 15, 16, 17, 18, 19, and 20, and occupy, at times, as much as four columns, so that the mere reading of them to the jury is said to have consumed several days. The display headings, with a few excerpts from the texts of the articles, read, respectively, as follows (February 14, 1915):

"Insane Girl Put Under Knife for Kinswoman of Dr. Pierson, 'B. S., M. D.'

"Helpless Ward of State Subjected to Operation Without Even Benefit of Full Anæsthesia—Single Cart is Used for Hauling Corpses, Food, Offal and Beef. The Dead are Buried Without Ceremony.

"By W. J. Leppert.

"The Times-Picayune expressed the conviction, on Sunday, that Dr. Clarence Pierson, 'B. S. M. D.,' was unworthy to be the head of the State Hospital for the Insane at Jackson, La.

"That conviction was forced after a three months investigation into conditions surrounding the insane and feeble-minded wards of Louisiana and after a painstaking contrasting of conditions in this state with those in Mississippi and Alabama. * * *

"To-day will be related some of the many facts that warrant the assertion that Dr. Pierson is, at heart, cruel, callous, inhumane by temperament and unfitted to hold an office wherein kindliness, respect for conventional decencies, and consideration for the rights and welfare of his patients are prime essentials. * * * *"

February 15, 1915:

"Pierson Disregards Professional Ethics in Jackson Asylum.

"Superintendent of Institution Fails to Protect Patients Left in Charge.

"Canny and Cunning Evasions and Adroitness Adopted by Him in Attempts to Block Thorough Investigations of Conditions at State Hospital.

"By W. J. Leppert.

February 16, 1915:

"Insane at Asylum Virtually Isolated At Mercy of Flames.

"Unfortunates Forced to Huddle Together on Concrete Floor of Wards.

"Inadequate Heating Arrangements in Large Rooms, with Broken Windows, Through Which Chilly Winds Blow. Dr. Pierson Gives Out Statement Asking Suspension of Public Judgment for Present.

"By W. J. Leppert.

"Had any reader of the Times-Picayune accompanied the writer in his first tour of inves-

tigation through the East Louisiana Hospital for the Insane, at Jackson, during the last days of November, he would have been fully as horrified as was the newspaper man.

"The institution at Jackson was the third of the kind visited. * * * Years of experience among people in distress, in jails, in hospitals and in other cesspools, wherein swirl human flotsam, had, in a measure, prepared the writer for a saddening picture," etc.

February 17, 1915:

"Dangling Ropes Tempt
State's Insane Charges
To Commit Suicide.

"Ropes are Found Hanging Within Easy Reach of Dr. Pierson's Patients.

"Monotonous Diet of Food, Exposed to Infection During Transfer from Kitchen to Dining Room and Eaten by Patients Without Aid of Knives Compares But Poorly with Epicurean Delicacies on Table in $9,800.00 Cottage.

"By W. J. Leppert."

February 18, 1915:

"Accounts of Asylum
Checked by Auditor
Condition Sorrowful.

"When Doctors Resign Their Lapsing Salaries Are Divided Among Others.

"Missing Vouchers Aggregating $1,561.35. According to Traveling Auditor A. M. Smith—Retainers Paid Outside Lawyers Despite the Fact that State Pays One to Care for Asylum's Litigations.

"By W. J. Leppert."

February 19, 1915:

"Dr. Pierson Enjoyed
Luxuries and Autos
At State's Expense.

"Traveled Widely but Never 'Docked' Himself For His Absences.

"Institution and Insane Patients Neglected While Servant of People was Away from Post—Interesting Correspondence When Scandal Reached Ears of Governor Hall. Failed to Resign, but Hastily Withdrew from Race for Political Office.

"By W. J. Leppert."

February 20, 1915:

"Slight Increase in Number
of Insane Costs the
State Heavily.

"Coal Consumption Runs Threefold Under Pierson Régime.

"System of Selling Farm Produce Competes with Farmer. Padding the Population—How Improvements Paid for by the State are Cast Away—A Costly Experiment in Railroading—Land Bought at Six Times Assessed Value—Shrinkage in Beef Buying.

"By W. J. Leppert."

In its answer, defendant alleges that—

"It concluded to have a thorough investigation made of the whole subject-matter, as well as the management and control of similar institutions in other states. * * * Thereupon your respondent engaged the services of a highly trained, trustworthy, and reliable newspaper man, and assigned him the duty of making the aforesaid investigation; that in the course of this investigation the facts were developed upon which the articles complained of were founded, and your respondent, in the discharge of its duty to the public printed the same."

Further answering, respondent shows that—

" * * * The said Pierson's unfitness [to be in charge of the feeble-minded and insane] is not only shown by the recitals of the aforesaid published articles, all of which are true, but by many further facts developed by the aforesaid investigation, * * * among which facts are the following."

And then follow 17 distinct charges, not included in the publications, which we merely enumerate, to wit: (a) That a patient named Jurgelwiez was too rigorously confined; (b) the necessary amputation of a patient's leg was made without the administration of complete anæsthesia, and the leg was burned in stead of being buried; (c) an insane girl, being bathed by an insane person, was so severely scalded that she died next day after suffering for six hours through want of attention; (d) work done by insane persons was taken over by Dr. Pierson and his family and sent

to their friends without compensation to the state or the workers; (e) turkeys were expressed to relatives of Dr. Pierson at the expense of the state, without compensation to the state; (f) employees and inmates were employed to make clothing for Dr. Pierson's friends and relatives without compensation; (g) an employee taught a child of Dr. Pierson's without compensation; (h) an employee nursed relatives of Dr. Pierson without compensation; (i) the office of assistant storekeeper was created to give a position to a relative of Dr. Pierson; (j) regular employees were discharged in order to employ members of a circus; (k) a printing outfit was purchased with state money and not used; (l) polluted water from the laundry was used in the boring of a well, and the boring was a complete loss; (m) insane persons are used in the drug store to fill prescriptions and deliver narcotics and deadly drugs; (n) an attendant gives hypodermics of morphine; (o) inmates of the asylum are whipped with strips cut from rubber hose; (p) a carpenter inmate was sent to work for Dr. Pierson without compensation to him or the state; (q) (r) an annual picnic is given, at the expense of the state, with no benefit to the asylum; (s) the whole conduct of the asylum is loose and incompetent and not in accord with modern ideas that prevail in other institutions; (t) little or no attention is paid to hygiene, sanitation or medical treatment, and (u) that—

*"the whole is, and constitutes a public scandal, * * * for which conditions said Pierson, as superintendent in charge thereof, is primarily responsible."* (Italics by the court.)

It will be observed that the reasons assigned, in the editorial of February 13 and thereafter, for the publications in question are made the bases of a "conviction" expressed by the editor, as the authorized spokesman of a newspaper boasting a circulation of from 50,000 to 55,000 in Louisiana, where Dr. Pierson was born and reared, the surrounding states, and elsewhere throughout the country and foreign lands, "that Dr. Clarence Pierson is unfit for the post which he occupies," which expression is followed by the equally authoritative statement that—

"In the series of articles whose publication begins this morning we shall present facts and reasons which have led us to that conviction."

We have therefore the declared intention of the defendant to publish a series of articles whose sole purpose is to inform the public of facts and reasons why Dr. Pierson should be held unfit to hold the position of superintendent of the state insane asylum; and we then have the series of articles conforming strictly to that announcement, beginning with the article in the same paper, in which the public is informed, in glaring head lines, that "Pierson Opposition to Asylum Inquiry Arouses Suspicion," that "Easy Explanations Fail to Cover Official Shortcomings," and, in the body of the article, that "So bitterly fought was the inquiry, that suspicion was engendered that something akin to 'rottenness in Denmark' existed in the East Louisiana Asylum," and that "the determination of the Times-Picayune was strengthened to ascertain the truth and lay bare any institutional rottenness it found"; and still another allegation may be found to the effect that the decision that Dr. Pierson is unfit to hold his position—

"at the head of that institution * * * is reached after a searching investigation, covering nearly three months, and *is based on acts that have been traced directly to him.* When the inquiry was begun the scope in no wise included *official wrongdoing. No thought of graft or kindred illegalities existed in the mind of the Times-Picayune. Scandal was not its aim. Crookedness on the part of officials, high and low was not included when first the investigation was planned or when it had measurably progressed,"* etc. (Italics by the court.)

The alleged "inquiry" having been completed when the foregoing was published, the plain inference to be drawn therefrom is that the suspected "rottenness" and the unsuspect-

ed "graft," "scandal," and "crookedness" had been brought to light, and was about to be disclosed to the public, and that the whole had been traced directly to the acts of Dr. Pierson. The writer of the articles is careful to make clear the intention to fix the entire responsibility for all that he published on Pierson; the headline writer, or whoever it may have been, is equally careful that Pierson's name shall appear in the largest capitals used in the paper, save those in the title, as the person against whom the articles are leveled, and thereafter in its answer, defendant alleges:

"That the said Pierson's unfitness is not only shown by the recitals of the aforesaid published articles, all of which are true, but by many other facts," etc.,

—and the "further facts" being set forth, the answer concludes with the allegation that the whole administration of the asylum "is, and constitutes, a public scandal for which said Pierson is primarily responsible."

From a diligent and protracted study of the record, we have reached the following general conclusions, to wit:

That the power to administer the affairs of the Jackson Asylum is vested in and is exercised by a board of administrators, created by law, and in attributing to plaintiff, a salaried employee of the board, with but little authority save such as may be incidental to his position as executive officer of the board, the responsibility for the entire policy and administration of the institution with no recognition of the responsibility of the state, in the matter of its appropriations, or if the board, for the disbursement of the funds actually appropriated, and with but scant and qualified recognition of numerous and highly beneficial measures authorized by the board and carried into effect under the direction of plaintiff, as superintendent, the publications here in question are shown to have been inspired by blind recklessness and a malicious desire to discredit plaintiff and injure him in the estimation of the community in which he lives and of the public at large.

That the published statement that plaintiff interposed opposition to the alleged investigation here in question of a character to "engender a suspicion of something akin to rottenness" in the management of the asylum, and the implication that such suspicion had been confirmed by said investigation, was wholly false, malicious, and misleading.

That the repeated statement that said alleged investigation was but part of a general inquiry into the condition of the insane in the three states of Lousiana, Mississippi, and Alabama was false, the facts being that no inquiry was undertaken in either of the states last mentioned, and that the alleged investigation in Louisiana, whatever may have been the instructions of defendant's editor and manager, was leveled, by the investigator, employed and instructed by him, at the plaintiff, with the intention of discrediting him and driving him from his position, rather than of rendering any service to the insane, and thereby of furthering the interest of the investigator, whose dominant purpose it was to make a pretended investigation which should not be a "failure," in the sense (as attributed by him to that word) that "failure" in such case means "failure to get your man," but should be a success, in the sense (contemplated by him) that by getting his man his pretended investigation would be justified, and he would be rewarded by promotion, with increased pay, in the service of the Times-Picayune or elsewhere.

That neither the investigator so employed nor his immediate employer (defendant's editor and manager) possessed the knowledge or experience required to make ex parte an investigation such as that here in question of an insane asylum containing over 1,600 inmates and 200 employees, with a view of determining the questions of the efficiency or

inefficiency of its administration and of the treatment of its patients.

That, in the main, the charges set forth in the publications complained of may be divided into the several classes, to wit:

Those which are wholly false, malicious, and misleading; those which contain half truths, which convey, and are intended to convey, false impressions, including alleged conditions, referred to as presently existing, but which had been changed for the better, to the knowledge of the investigator, long before he appeared; those in which conditions complained of were in course of being changed, to the knowledge of the investigator, when the pretended investigation began, of which circumstance the publications make no mention; acts of omission and commission by subordinates, which, without fault on the part of plaintiff, came to his knowledge only after the events, and with respect to which he then took such action as was proper and possible; acts of that character of which plaintiff never heard until they were stated in the publication in question or in defendant's answer; charges which are patently frivolous or inconsistent, or which defendant, though averring their truth in its sworn answer, has made no attempt to sustain by evidence.

One or two other matters, not included in the foregoing will receive due attention in the course of this opinion.

It is proved that the Governor (Blanchard) under whose administration, in 1905, plaintiff was elected by the board of administrators to the position of superintendent of the Jackson Asylum, attended every meeting of the board save one during the four years of his administration. His successor, Gov. Sanders (1908–1912), is shown to have taken a very active part in the affairs of the asylum and to have attended every meeting of the board that it was possible for him to attend. He says in his testimony:

148 LA.—27

"The institution was not run by Dr. Pierson. It was run by the board. * * * The board formulated the policies. Dr. Pierson carried them out."

The law (R. S. 1763, 1764) requires, and the witnesses testify, that the expenditures, save the wages of subordinates employees (which the publications complain are too low) and small items of petty cash, shall be, were, and are determined by the board. The chairman of the Executive Committee has lived for years and attended to his business, as president of a bank, and farmer within 12 miles of the asylum, and has kept in almost daily communication by phone or otherwise, with the superintendent, and the latter has taken no important step without consulting with him, and, when necessary, obtaining special authority from the board. The testimony to the effect thus stated is conclusive; there being no attempt to contradict it.

The questions whether the funds of the asylum should be expended in the various ways suggested by the investigator, rather than as determined by the board, and various other questions, the responsibility for the determination of which defendant has charged to the superintendent, were wholly within the jurisdiction of, and were considered and determined by, the board. The questions of the animus which inspired the alleged investigation and the investigator, and the publications here in question, and particularly of the truth of the published statement, that plaintiff's opposition engendered a suspicion of rottenness (attributed to him) in the administration of the asylum, which the investigation went far to confirm, require a review in detail of the circumstances leading to this suit, which we now present, in their chronological order, to wit:

In the spring of 1915 plaintiff and several other citizens were discussed by the press and the electors as candidates for the gubernatorial nomination, and the Times-Picayune dis-

approved of three of them, including plaintiff, in an editorial published in September. In the spring of 1915, also, and, as we conclude, following the disclosure of plaintiff's candidacy, the editors and managers of the Times-Picayune decided that it was the duty of that paper to investigate the condition of the insane, it is said, in Louisiana, Mississippi, and Alabama, but the evidence, and lack of evidence, to which we shall refer, show that no serious investigation for publication was actually prosecuted elsewhere than in the asylum of which plaintiff was superintendent, and that the purpose of the investigator employed by defendant was not to make a thorough and fair investigation and a report showing the good as well as the imperfect conditions found by him, but to find anything which, of itself, by distortion or by the aid of lurid word pictures, might be published to the injury of plaintiff. It is for that reason that we refer to the investigation as "pretended" or "alleged," since the work of ascertaining and reporting only that which was prejudicial, or could be made so, involved an "investigation" only of a sort. The investigator in the case was Mr. W. J. Leppert, and he was selected by Mr. D. D. Moore, one of defendant's editors and managers, who testifies that he had known Leppert long, and considered him well-equipped for such work. At what time exactly the selection was made is a matter which the evidence leaves in some doubt. We, however, consider it established with reasonable certainty that the collection of information and misinformation on which the investigation was subsequently predicated would have been entered upon with a view of defeating plaintiff's nomination, and in good time for that purpose if it had not been that plaintiff withdrew his name from public consideration as a candidate on, say, October 15, 1915. It, then, of course, was no longer necessary to attack him in order to prevent his securing the nomination, and defendant rather emphasizes that point. There were, however, some 200 persons employed by the superintendent, among whom were probably a good many voters, and in the past that office has been regarded, whether with reason or without, as something of a political plum, a species of fruit which defendant professed at that time to be engaged in an effort to eliminate from the list of Louisiana products. It may be therefore that it was moved to proceed by that consideration, taken in connection with the data that it had collected and its possible engagement or tentative engagement, of the services of Mr. Leppert, who with some little hesitation testified that he thought he was actually engaged on October 29, and (later in his testimony) on November 5. But whilst the motive and purpose of defendant's editor and manager is of importance as perhaps influencing the report turned in by its investigator, and its publication after it had been considered, the motive and purpose of Mr. Leppert is of still more importance, as interpretative of his methods and of the report as made by him sent in for publication, and published by authority of the editor and manager.

According to the testimony of Mr. Moore, he (Leppert) was instructed to call on and cooperate with the board of administrators and the superintendent of the asylum, or asylums, visited by him. Mr. Moore says that he gave him but little information and but two letters —one, from a lady in New Orleans, and another, accompanying the first, from a patient in the asylum, which he gave "for what it was worth," as letters from lunatics and anonymous letters are not considered information in the newspaper business. Mr. Leppert testified that Mr. Moore (quoting)—

"told me what he understood to be the conditions in both institutions [Jackson and Pineville, La.]. He told me he had received a number of communications bearing upon the subject, and he turned a lot of them over to me."

That his instructions from Moore were "to investigate the conditions and ascertain whether the information he gave me was or was not correct, and to report back to him." He further testified that after November 5 he spent several days in New Orleans, studying his subject, at the Law Library reading the statutes and having them copied, and elsewhere; paid visits, on two days, to the detention hospital, of which he made a verbal report; went to Baton Rouge, and thence to Pineville, where he arrived about November 12 or 14; found the superintendent of the asylum absent, but proceeded with his investigation for one week during his absence, and for another week after his return; that he went to Jackson about November 28 or 29, and it is undisputed that he paid his first visit to the Jackson asylum on Wednesday, December 1, before noon, having arrived from New Orleans on the morning train, and, as at Pineville, he found the superintendent absent but nevertheless proceeded with his investigation, under the ciceronage of Dr. Cooper, senior assistant physician, in charge as superintendent, who had had a serious difference with plaintiff and had tendered his resignation, which had been accepted, to take effect on December 21.

It is further shown that within a few hours after Leppert arrived Dr. Cooper telephoned that event to plaintiff, then in New Orleans, and there is some difference between them as to the purport of the conversation, our finding upon the subject being that Cooper did not give Pierson any definite idea of the purpose of Leppert's visit, or convey the impression that Pierson's presence was needed or wanted, and that Pierson gave him to understand that, unless his immediate presence was required, he would fill certain engagements in New Orleans and return to Jackson on the following day (Thursday, December 2) or the day after, and that in the meanwhile the visitor was to be shown around as usual,

and treated courteously. Leppert was accordingly shown around during the rest of the day, and afforded every facility that he required for verifying or disproving a mass of data, contained in what he called his "dope book," and in many letters, according to his testimony, from patients in the asylum, employees who had been discharged, had withdrawn, or were still employed—all with grievances—and from "correspondents," meaning, as explained by the witness, local correspondents, at various places, of different newspapers, as to whom the witness after considerable cross-examination admitted that none of them complained of the asylum. It is shown that among the first persons interviewed by the investigator were two female patients; the one, the patient whose "letter" Mr. Moore says he turned over for what it was worth, and of whom the investigator says that he had several of her letters, the other, a girl of some 20 years, who figures prominently in the publications of February 14 and 15, of whom Dr. Herring testifies that she belonged to what may be called a high grade feeble-minded class, which seems to mean that, though she understands what she likes and dislikes, and can converse with sufficient intelligence on simple subjects, asking and answering simple questions, she lacks the degree of intelligence that is usually to be expected at that age. Later in the evening of the first day (December 1) between, say, 5 and 6 o'clock, Mr. Leppert himself called Dr. Pierson over the phone, and again there is a difference in the testimony as to the conversation. Mr. Leppert says:

"I told him that I had found so many things to exist there that it was essential that I should lay them before him. I wanted to see him before Mr. Moore left for New York, as he was about to leave. * * * Dr. Pierson said that he would return to Jackson on the following day, and that he would there see me. I told him I was stopping at the hotel, and he said that he would be in Jackson and would meet me. Q. Now the next day what did you

do? A. I continued the investigation. * * * .Q. Did he [Pierson] keep his engagement with you? A. No, sir, he did not; I stayed at the hotel until 4 or 5 o'clock [the next morning] and, finding it essential to leave, being the only chance I had to get Mr. Moore before his going to New York, I got the early morning train, waiting there all night for Dr. Pierson to call me."

On his cross-examination, his testimony reads in part as follows:

"You telephoned Dr. Pierson that you were going to leave Jackson the next day yourself, and therefore he had to come up to see you that evening? A. I will tell you exactly what I told him. Q. Pray do. A. I told Dr. Pierson that Mr. Moore was going to leave for New York, and it was necessary for me to see Mr. Moore before he left, and that I would leave on the next train. Q. When was the next train? A. On the morning train. Q. You were phoning Dr. Pierson at what hour, on what day? A. Between 5 and 6 o'clock of the evening of the first day of my arrival at Jackson. Q. And the first train out of Jackson, Dr. Pierson could very well assume, was the next train? A. Yes; I grant he was at liberty to assume that, as much as I was the other way."

What "other way" he meant is not explained. Dr. Pierson testifies that Mr. Leppert expressed some interest in his (Pierson's) stay in New Orleans, with a view of finding out whether they could meet there, but gave him no impression of urgency, or as to the purpose of his visit to Jackson; that if he had understood his purpose he would have been willing to return by airplane; the substance of his testimony being that he did not consider the conversation important or as intended to make, or as making, any definite engagement to meet Mr. Leppert.

Dr. Cooper, called as witness for defendant, testified that, as he remembered it, there was "some talk" (evidently on the part of Leppert since Pierson was talking in New Orleans) "* * * about making an engagement with Dr. Pierson in New Orleans." During the same evening, the work of investigation having been discontinued for the day, the medical staff, consisting of Drs. Cooper, Holbrook, and Evans, the secretary, Mr. Richardson, and Mr. Leppert, assembled in the staff office (otherwise spoken of as Dr. Pierson's office) and in the course of their conversation Mr. Leppert said that he had come there to make an investigation; that two men (employed for the purpose by the Times-Picayune, as we understand) had undertaken a certain investigation in Baton Rouge and had failed, but that he did not intend to fail. Being asked what, in his opinion, constituted a failure in such case, he replied, "When you fail to get your man."

The testimony to that effect was given by Drs. Holbrook and Evans and Mr. Richardson, and is uncontradicted.

Mr. Leppert did not go to New Orleans on Thursday, December 2, as he had phoned Dr. Pierson he intended, but spent the whole of that day in a further attempt to make his investigation a success by verifying, under the ciceronage of Dr. Cooper, and in the absence of Dr. Pierson, the "dope" that he had brought with him, and in avoiding such things about the asylum as he had reason to suspect might redound to the credit of its management. He finished his work for the day about 5:30 p. m. and returned to his hotel, though he knew that, if Dr. Pierson came on that day he would arrive in Jackson at 6:30 p. m., and would be at the asylum soon afterwards. But, being unconscious of having made any specific engagement, as to time or place, with Leppert, Pierson gave his attention to other matters. Leppert, on the other hand, according to his testimony, considered that an obligation rested on Pierson, in the event of his arrival, after a day in New Orleans and a railroad journey to Jackson, to seek him, or call him up, at his hotel, or wherever he might be, although, according to the testimony of Mr. Moore he had been instructed to call on, and co-operate with, Pierson, and might be supposed to be the

seeker (belated though he was) of that gentleman; and we find nothing, even in his testimony, which affects that supposition. He testifies that Pierson phoned from New Orleans that he would meet him in Jackson, but, even if he did, such a statement, reasonably construed, meant nothing more than that—

"I will be in Jackson, at 6:30 p. m. or shortly thereafter; and, as you say that you want to see me, you will find me in my office at that place and hour."

But Leppert further testifies that he did not consider it incumbent on him to do anything more towards bringing about the meeting that he professes to have been seeking than to wait, the night through, for Pierson to call him, or perhaps to call *on* him. He does not deny that he might have had the use of the telephone, whereby in a few minutes he could have found out whether Pierson had arrived and have arranged the desired meeting; and, as he admits that he had phoned to Pierson that he intended to leave Jackson for New Orleans on the morning train, it appears to us that he might have considered the possibility of Pierson's assuming that he was in New Orleans, since he had not been Pierson's fellow passenger on the evening train upon which he (Pierson) had arrived. People frequently misunderstand each other about appointments to meet, and it is safe to say that, in these days, when a man of ordinary sense really desires to avoid a misunderstanding as to the time and place and circumstances of a meeting, rather than to avoid the meeting, and is within reach, by telephone, of the person whom he wishes to meet, he will use that instrument. Mr. Leppert might have done so in order to learn whether he would find the superintendent of the Pineville asylum at his post, before he made his journey to that place and, in order to learn, before visiting the Jackson asylum, whether he would find Dr. Pierson there, or, if he is correct in his testimony, to the effect that he arrived in Jackson about the 28th or 29th of November, he need not have used the telephone, as almost any one whom he met would probably have been able to enlighten him on that subject. His statement that he did not consider it "incumbent" on him to take any such step could be true only if he felt under no obligation of decency or good conscience to lay before Pierson the charges which he had, by Thursday evening, decided to bring against him (as he himself testifies), in order to give him a hearing, but had determined, in the rôles of prosecutor and judge, to convict and sentence him unheard, and turn him over to the defendant, for execution, in the form of a publication intended to destroy his character. From all of which and from subsequent happenings, we conclude that it was no part of Mr. Leppert's plan to meet Dr. Pierson, so long as he could avoid it, or to co-operate with him at any time.

The subsequent happenings above referred to were as follows: As testified by him, Mr. Leppert went to New Orleans on the early train on Friday, December 3, 1915, and had an interview with Mr. Moore on the evening of that day, at which he mentioned that Dr. Pierson was not at the asylum when he arrived, but that it was an accident, or was not his fault, etc. It does not appear that he complained to Mr. Moore that his failure to meet Pierson was attributable to the breaking by that gentleman of any engagement with him. He returned to Jackson that night, or the next day, and, during the morning (of Saturday, December 4) called at the asylum, met Pierson for the first time (while engaged in the investigation here in question), and, on Pierson's invitation, was taken out to the farm colony, some three miles distant, where he investigated for two or three hours, after which he was taken back to the asylum and invited to lunch, but declined and went to his hotel. He returned to the asylum in the afternoon and prosecuted his investigation un-

til, say, 5:30 p. m. and then to all appearances amicably requested that instructions be given that he should not be detained at the gate upon his next visit or, thereafter, and, receiving an assurance that such instruction would be given, he bade Dr. Pierson good evening, and again repaired to his hotel. But during the whole time that he and Pierson were together the question of the alleged broken engagement was not mentioned by either of them.

It is shown without contradiction that among Mr. Leppert's fellow guests at the Weber Hotel were a Mr. Yost, who had done plumbing work at the asylum at different times and was about finishing, or had finished, a job of that kind and contemplated returning to his home in another state, and a Mr. Heckensen, who was engaged in putting in concrete work for bridges that he was to build across Thompson's Creek; that Leppert became rather intimate with both men, and had frequent conversations with them. He testified that Yost was "very useful to him, assisting in a way," and Yost testified that Leppert was continually talking to him about the asylum. Referring to one such conversation, Yost said:

"He went on to tell me that he had been hired by the Times-Picayune to come down from Alabama to take up the investigation, and then he laid great stress upon the fact that he was an expert in this business. I said: 'If you came down here to make this investigation of the institution, why did you go to the Pineville institution? He said: 'Dr. Pierson was so well entrenched over there that he could not get in unless he did go to Pineville and the city hospital as a blind.'"

He further testifies that on the Saturday evening after Leppert's arrival he invited him to attend a little play at the schoolhouse, and that Leppert formally introduced himself, saying, "I know you; you work for the institution;" and that, though Yost intimated that he did not care to discuss the institution, he kept on talking, until Yost said, "I suppose that all the people will say you are going to pump me for all I am worth," to which Leppert replied, "Yost, I don't have to pump you for anything; I have all the dope we want; I had it when I came here." On the following day (Sunday, December 5) Yost met Leppert, on Thompson's creek, with Heckensen, and, Heckensen having left them together, Leppert again began talking about the asylum:

"He told me [says Yost] that it was the rottenest place that he had ever run across in his life; that he was making investigations for 25 years, and that place was the limit; graft all over, in fact, it was rotten to the core; * * * that he was going to stay on the job until he accomplished his purpose. He came there to make an investigation; he said it was not going to be like the investigation that was pulled off in Baton Rouge. He said a couple of men tried that job and fell down on it. I don't know what job he had reference to, but he said he was not going to fall down on this job."

Yost further testifies that Leppert told him:

"That the Times-Picayune was worth $250,-000, and that they had a credit of $250,000; that they were going to carry this investigation on, and were not going to allow outside influence to interfere; * * * that he had spent $150 of his own money in this investigation, which certainly meant very much to him. He said that the success or failure of this investigation meant his home in Alabama. * * * He said the success or failure of this investigation meant his plantation. * * * Q. Did he tell you what he was getting for it? A. Yes. $175 a month salary. * * * He told me it meant a steady job for him."

Yost gave his testimony in December, 1916, and Leppert gave his about six months later, and mentioned Yost as having been useful to him, but did not contradict the statements above quoted.

Heckenson testified that he and Leppert hired a vehicle and drove to Thompson's creek, where they found Yost, and had some talk with him, and that he left Leppert and Yost together; that in his conversation with Leppert the latter told him, among other things, "that he would have Dr. Pierson filed

away from the state insane asylum." He further testified that, on the same occasion (Sunday, December ·5, 1915) Leppert said that—

"The officials of the Pineville asylum had turned everything over to him and let him have his own way, and that he found everything all right; and that if Dr. Pierson had done the same thing here he would not have been so particular about matters; * * * that he had a letter from the Governor, * * * and that he had a right to go through the asylum * * * and through all the books; that Dr. Pierson had ignored him and would not allow that. · He said that Dr. Pierson was a liar and a grafter. * * * We were at the Weber House nearly three weeks together. We took meals together. Mr. Leppert talked about the institution, and said nothing that was very complimentary. He talked about the institution freely there. I assumed from his manner and talk that his manner was unfriendly to Dr. Pierson, from the time he took the buggy ride with me."

We may as well note here that Mr. Leppert was prosecuted, in Jackson, for slandering Dr. Pierson, convicted and sentenced to pay a fine, which he paid, and that, on the trial of this case, he stated, on his oath as a witness, that the judge ad hoc, by whom the fine was imposed, had been selected by Dr. Pierson's attorney—a statement so untrue and utterly reckless that he subsequently withdrew it—the facts in that connection being, that the presiding judge having recused himself, a judge ad hoc was selected by Leppert's attorney, in agreement with the prosecuting officer; that but one witness was called by the prosecution, and that he testified that he was stopping at the Weber Hotel when Leppert was there, and that he heard Leppert say:

"That Dr. Pierson was a crook, a political grafter, a thief, and a liar; that the doctor had not treated him courteously when he came to the institution to make his investigation; that he would yet get his job away from him; that he would fix him so that he could not make a living in Jackson—or words to that effect."

There appear to have been no witnesses called for defendant, nor did he take the stand in his own behalf.

During Sunday, December 5, as well as on Saturday, December 4, Mr. Leppert as we have stated, devoted a good deal of his time to the denunciation of Dr. Pierson and of the management of the asylum, in that way, on the street, entertaining several persons at a time; and his observations were duly reported to Dr. Pierson, who in the meanwhile had instructed the gatekeeper not to detain him when he appeared, but to escort him at once to his office. When, therefore, Leppert appeared on Monday morning, and was detained at the gate until his arrival was announced, and the gatekeeper returned to escort him to the office, he became very indignant, and so remained, even after Pierson had expressed his regret that he had been detained, and explained that the gatekeeper had misunderstood his instructions, he merely replying to the explanation that he had been promised that he would not be detained. He then requested that he be given a certain minute book that he had been examining, and, taking his seat in the secretary's office, he continued his examination for a short time, and then asked for a copy of the laws governing the institution, which was furnished, in the form of a pamphlet obtained from Dr. Pierson, who followed the secretary into the office where Mr. Leppert was seated, and about that time Leppert arose to his feet, demanded to be informed why he had been stopped at the gate, said that he would enter a protest, and became insulting to Pierson, who told him that the asylum was open to his inspection, but that he could not be permitted to go through it unaccompanied, as he had been doing before his (Pierson's) return. Leppert's version of the matter is somewhat different. He stated, in giving his testimony, that some words

were passed between Pierson and himself when he was first ushered in; that (quoting):

"I told Dr. Pierson then that I did not propose that he should treat me after the arrogant and atrocious manner that he used to his employees; that he had no warrant in breaking his word to me, and I wanted to know exactly how far he intended to go in directing the inquiry. I said: 'Did I understand you to say that you intend to be with me at all times and while I am interrogating the employees of this institution.' He said: 'I do.' * * * I said: 'How about when I come to examine the records; do you propose to be with me?' He said: 'Yes, I do, because I know more about this institution than any one else.' * * * Thereupon Dr. Pierson said, 'Is there anything I can do for you?' I said: 'I would like to get the minute book I was reading. It was handed to me. I sat down to read it. I confess I was completely nonplussed, and for a time didn't know what to do. I sat down, and it took me about half a minute to make up my mind what I would do, and then I decided that it was an absolute attempt to interfere with what was to be a full and fair investigation. [Pierson, having gone out of the room, was then recalled, and the witness goes on:] I told him that, because of his action, of what I deemed an interference with me in the investigation, I would withdraw from the institution; that I didn't propose to have anybody tagging around with me at my elbows when I am interrogating the employees."

Leppert then left the asylum, wired to Moore that his investigation had been headed or blocked off, and asked for instructions, to which Moore replied, instructing him to call on the Governor and the board, and he called on the Governor, to whom he made his own representations, obtained from him letters addressed to Dr. Pierson and to Mr. West the vice president of the board, respectively, renewing a request, in a previous letter, that Mr. Leppert be afforded every facility for obtaining such information as he desired; and, on the following day (December 7), he inclosed to Dr. Pierson the letter from the Governor, in a letter from himself, reading as follows (omitting formal parts) to wit:

"By virtue of the inclosed letter from Gov. Hall and in my capacity as a special staff representative of the Times-Picayune, a taxpayer of Louisiana, I request every facility for making *a full, free and unrestricted* investigation into the affairs of the state institution of which you are the executive head."

"I request opportunity be afforded me to interrogate the state employés and examine *any and all of the physical property* of the institution *without the forced attendance of anybody representing the administrative department.* At the request of Mr. West, I inclose herewith a letter from Gov. Hall to Mr. West in his capacity as vice president of the board of administrators.

"I shall be at the Weber Hotel, and would thank you to send me *such a permit as will admit of an unrestricted investigation.*" (Italics by present writer.)

It will be noted that the request so conveyed is for unrestricted and unaccompanied access, at the pleasure of the writer, to any or all of the physical property of the institution (which necessarily included the male and female wards), as also unrestricted opportunity to interrogate the employés of the institution.

There was then some further correspondence, temperate on the part of Dr. Pierson, offensive on the part of Mr. Leppert, who denied that he had asked to visit the wards, male and female, alone, but receded from the position assumed in his letter of December 7, saying:

"So far as regards a guide, I would accept the suggestion in any visits to the wards and dormitories. It is entirely unnecessary, however, to furnish a guide to ramble across the farm colony, the graveyard, or the other physical property, not strictly occupied by inmates, nor would a guide be needed in the office, or where the records are kept, if the subordinates in charge of the office were instructed to give me unreserved information."

As the result of the correspondence, a meeting of the executive committee was convened on December 8, at which the following resolution was adopted (omitting the preamble) to wit:

"Be it resolved * * * that Mr. Leppert, accompanied by his stenographer, and also (at the suggestion of Mr. Leppert) by Dr. Holbrook, and a state stenographer, if necessary, * * * be accorded the privilege of visiting any and all parts of the grounds and buildings, communicating with any employee or attendant, and the opportunity of securing such information as he may desire from that source and from the records of the institution."·

Mr: Leppert was present at the meeting, and gives the following testimony concerning it, to wit:

"Q. Did you go before the board? A. Yes; I did, by invitation. Q. Was it harmonious? A. Yes, very harmonious and very pleasant. * * * Q. What was the result of the meeting? A. They asked me what I wanted—we just had a pleasant little conversation; they asked me what I wanted, and I told them all I wanted was an opportunity to continue the investigation, and I didn't think Dr. Pierson had the right to be right at my elbow during the investigation, when I was interrogating state employees, and I certainly did not see any reason why he should be there while I was examining parts of the physical property; and I told them that I didn't care to have an investigation conducted through the medium of Dr. Pierson, but I would accept anybody else there—a guide or an attendant—or one of the staff. Q. That was finally accepted? A. Yes, sir. Q. Did you state which of the medical staff you were willing to take? A. I just said that I would take any one—Dr. Holbrook or any one else—it was a matter of immateriality to me. Q. And they passed this resolution which gave you the right to investigate, accompanied by Dr. Holbrook? A. Yes; they showed me the resolution, which was acceptable to me."

Dr. Pierson did not attend the meeting, and subsequently on the same day the executive committee which was the body that passed the resolution, authorized Mr. West, its chairman, vice president of the board, to address the following letter to him, to wit:

"Jackson, La., Dec. 8, 1915.

"Dr. Clarence Pierson, Superintendent. It was the sense of the executive committee * * * after a resolution regarding Mr. Leppert of the Times-Picayune was passed, that its interpretation of the resolution was that Dr. Holbrook was to accompany Mr. Leppert at all times when he was visiting the different ·buildings of the institution, also, at the time any and all employees or attendants of the institution are interviewed. It is also understood that when Dr. Holbrook cannot be present on · account of professional engagement, Dr. Holbrook designate some one to take his place and act in his stead."

As to the time at which Mr. Leppert was informed of the existence and contents of the letter in question, we find no reason to doubt the correctness of the following testimony, given by Dr. Holbrook, to wit:

"The day of the board meeting, December 8th, after the resolution was passed * * * Col. Nicholson [a member of the board who died before the trial] and Mr. Leppert and his stenographer and myself were in the clerk's office, which office is opposite the office in which the board met. Mr. Richardson handed me a copy of the interpretation the board had placed upon the resolution the board had just passed. I read this document and gave it to Col. Nicholson to read. Then it was given to Mr. Leppert, who also read it. He read this interpretation within 10 minutes after it had been given me. At this time, he started to demur about something in the interpretation, but apparently changed his mind, for he said it was all right."

The letter and the resolution speak for themselves and, in our opinion, the letter contains no requirement or restriction that is not contained in the resolution. Mr. Leppert testifies that if the letter were susceptible of the construction placed on it by him, the supposed requirement to which he objected was waived, and that he proceeded with his investigation. It is not pretended that any action was thereafter taken by the asylum authorities which conflicted with the privileges granted by the resolution. And yet 16 days later, on December 24, Mr. Leppert wrote to Vice President West, saying that the letter to Dr. Pierson had been written without his knowledge; that "he declined to be bound by that clause which attempted to restrict his inquiry into the records and in interview-

ing responsible officials of the administration," and further as follows:

"Because of the unexpected action at your hands, I beg to advise that I consider myself freed from my agreement to confer with your body and submit the result of my findings prior to publication."

As has been stated, the original purpose was to publish the first of the articles out of which this suit has arisen on Christmas Day, and Mr. Leppert's letter of December 24 seems to have been written with a view of clearing away any such obstacle as his promise to submit it to the board and the superintendent, as might stand in the way of its publication on that day. His complaint that the letter to Dr. Pierson withdrew or affected, to his prejudice, any privilege granted by the resolution, appears to us to be utterly unfounded and insincere, and is well answered in a letter from Mr. West, from which we make the following excerpts:

"In answer, will say that, in my judgment, your letter is absolutely uncalled for and unmerited, and not in keeping with the facts in the case. I am inclosing you a copy of the note of Dec. 8th from myself to Dr. Pierson, which is evidently the cause of your complaint. In this note to Dr. Pierson, I state [then follows copy of note of Dec. 8th]. You will find this note strictly in keeping with the resolution passed by the executive committee on the same date, a copy of which was furnished to you. You will remember that Dr. Pierson was not present when the resolution was passed. It was read to him afterwards, and, as he did not thoroughly understand it, there being some doubt in his mind regarding its interpretation, the executive committee authorized me to write him a letter which would more thoroughly explain to him the intent of the resolution.

"You must understand that Dr. Pierson is the superintendent of the institution, and is entitled to have a certain amount of control over your actions while at the institution, whatever may be your mission or purpose. The letter does not in any manner interfere with your privileges as they were given to you by the executive committee and clearly shows that your insinuations, as contained in your letter, are without foundation and absolutely unjustified. * * * You express the de-termination to repudiate a promise made by you to the executive committee, to submit to the full board any report which you intended to make to your paper, before publication. We can only interpret such intention on your part as the antithesis of the expression you gave the committee, which was that you intended to write nothing but a fair-minded, impartial, report. I am inclosing a copy of your letter and of this letter to the management of the paper which you have the honor to represent."

To the letter thus quoted, Mr. Leppert wrote a reply from which we quote:

"You state that my 'insinuations, as contained in your letter, are without foundation and absolutely unjustified?' I make no insinuations and distinctly call a spade by its proper name, when, in my letter of December 24th, I state directly that the letter procured by Dr. Pierson and written by yourself; 1st, was written without my knowledge; 2nd, became known to me accidentally; 3rd, that it contained a clause under color of which Dr. Pierson sought to defeat the ends of an honest investigation; 4th, that I was taken by surprise and therefore felt warranted in withdrawing from an agreement which was underhandedly violated by the other side.

"You will note I make no insinuations, but directly charge that you, having assumed responsibility for the letter, broke your word by a process of deviousness peculiar to the asylum management."

In the testimony given by him in this case, Mr. Leppert seems practically to admit that he was under a misapprehension as to the meaning of Mr. West's letter to Dr. Pierson, and to rely upon the position that he then thought that Mr. West's letter required that he should be attended, while examining the records of the asylum, and that the resolution did not so require. The resolution, however, appears to us more readily susceptible of that construction than the letter, but whether such requirement was intended by either instrument, we are quite clear that it was well within the power of the board of administrators, or its executive committee, since it is inconceivable that the records of such an institution, or of any public institution, should be left open to the unrestricted

and unguarded handling and perhaps, mutilation of any individual who may demand access to them; and the authority to determine, in a given case, whether such demand should be complied with, is vested, in this instance, not in the Governor, or in defendant's editor and manager, but in the board, specially created and authorized to administer the affairs of the asylum, and incidentally to preserve its records. To which we may add that the law makes it a penal offense for any one to enter any of the buildings or inclosures of the insane asylum without permission, and commit any trespass or depredation thereon or annoy or disturb the quiet of any patient, or abduct or seduce any patient to elope, or attempt to do so or to assist therein (R. S. 1772, 1773), and it seems to us entirely within the power of the board to exclude or keep under surveillance any person entering the premises whose good purpose and good faith it may have reason to doubt.

The purpose of the investigator, in this instance, was a malignant one, for the accomplishment of which he sought, in furtherance of his own interest and without regard to the welfare of the insane wards of the state, or to the service which Dr. Pierson had rendered, and was rendering, in that behalf, or to the public interest, to destroy plaintiff's character and drive him from the position in which he was earning a livelihood for his family and himself; and, as means to that end, he entered upon his pretended thorough, and fair investigation by attributing to plaintiff responsibility which had never been imposed on him and which had not, and could not, lawfully, have been assumed for the entire administration of the asylum; with the deliberate intention of seeking out and exaggerating every act of commission or omission pertaining to that administration and its actual or possible effects to which, in his biased judgment, or imagination, fault, negligence, or evil motive could be attributed;

of ignoring all good work done and all beneficent results achieved by plaintiff; and of publishing to the world, in the columns of a widely circulated newspaper, a lurid report, replete with falsehoods and half truths, of existing conditions and conditions which, by plaintiff's direction had long since ceased to exist, thereby bringing doubt, anxiety, and sorrow to the widely scattered members of the community having relatives and friends among the patients of the asylum and who were without the means to afford the relief which such report would seem to demand, whether by the removal of the patient or otherwise, thereby exciting a widespread, unjust, and injurious feeling of resentment and hostility to plaintiff among the people of the community in which he and his family were born and reared and had hopes of living happily in the future.

It was quite natural, therefore, and as we think quite within the authority of the executive committee, and of plaintiff, as superintendent, in the absence of any action by that committee, to require that Mr. Leppert should be escorted directly from the gate of the asylum to the office of the superintendent, without being afforded the opportunity while being announced to wander at will through the asylum and create excitement and unrest among its 1,800 or 1,900 patients and employees.

[3] We are of opinion that, if such an institution, established and administered by the state, is thought to require investigation, the General Assembly is the proper authority to order it, and we know of no right in any individual, or any corporation, be it a publishing company or other, to assume that function; nor, in our opinion, has the Governor, as such or as ex officio president of the board of administrators, the authority to ignore the regulations established by such board for the governance of the institution; for the law vests the power to establish those regulations in the board, and that power, as

also the power to enforce the regulations, must there remain, until transferred elsewhere, in a manner provided by law. Nor, do we understand that the Governor has in this instance attempted to exercise any such authority; the meaning of his letters, as we interpret them, having been merely the request that Mr. Leppert be furnished with such facilities for making his investigation as the regulations, to which the Governor himself was a party, and the law might permit or require.

Mr. Leppert testifies that, after the occurrence of December 8, he ignored Dr. Pierson, and, though his pretended investigation extended until some time in February, 1916, it is undisputed that, from and after that date he held no communication with Dr. Pierson, save (as he says) to "pass the time of day"; that Dr. Pierson, in no manner whatever, interfered with him or with the work in which he was engaged; and it is established beyond dispute that prior to December 8, 1915, Dr. Pierson had interposed no obstacle to the investigation, save as authorized by the law and the established regulations and required by his duty, but had merely insisted that it be conducted in accordance therewith, and not with the unbridled license to which the investigator assumed to be entitled; for it will be noted that in his letter of December 7, Mr. Leppert requested—

"every facility for making a full, free, and unrestricted investigation * * * opportunity * * * to interrogate the state employees and examine any and all physical property of the institution, *without the forced attendance of anybody representing the administrative department,*" and *that there be sent to his hotel* "*such a permit as will admit of an unrestricted investigation.*" (Italics by present writer.)

It will also be noted that on the following day he acquiesced in the action of the committee in requiring that he should be accompanied in his investigation by an assistant physician, "representing the administrative department," whom he named, though he testified that he informed the committee that any other employee would be acceptable to him, except Dr. Pierson."

We have here presented, therefore, the somewhat remarkable circumstances that on December 7 Mr. Leppert made a demand of Dr. Pierson that a "permit" be sent to his hotel, authorizing him to make an unrestricted investigation, without the forced attendance of anybody representing the administrative department of the asylum; that on December 8 he acquiesced in a resolution adopted by the executive committee, authorizing the investigation, but requiring that the investigator be accompanied by a representative of the administrative department, who was named by the investigator, though he informed the committee that any employee would be acceptable to him, except Dr. Pierson; that the committee actually conceded the exception, and in effect set aside its executive officer and agreed to substitute a subordinate to discharge a function pertaining to his position, at the instance of a person without right in the premises, and who had spent the greater part of the preceding week in a pretended investigation, in which he investigated only that of which he assumed whether truthfully or falsely, ill could be spoken with impunity, and in grossly slandering the entire management of the asylum of which they were administrators; that on the same day that the resolution was adopted the committee (through its chairman) addressed a letter to Dr. Pierson, interpretative of the resolution, but in no wise affecting its meaning, to the prejudice of the investigator, to whom it was shown on the day that it was written, or, at latest, the next day, and who registered no objection thereto, but proceeded with the investigation, subject to the conditions imposed by the resolution; and that on December 24, the day preceding that on which his report was to

have been published, he addressed a letter to the vice president of the board of administrators, informing him that he (the writer) considered himself freed from his agreement, to confer with the board and submit to it the result of his findings, prior to its publication, the bald pretext assigned for that action being that the letter of interpretation had been written without his knowledge, and that it made a change in the conditions prescribed by the resolution, which pretext was admitted to be such, on the trial of the case, when the investigator admitted that he was unable to point out any difference in meaning between the resolution and the letter.

The published statement that the investigation was inaugurated with no purpose or desire to dig up sensations or scandals, and that "there are sensational and harrowing details whose suppression is desirable," with the implication that they had been suppressed, are utterly at variance with the publications themselves. Thus, though there had been no such thing at the asylum, for four years, prior to the advent of Mr. Leppert, as the "cart" mentioned in the headlines of the article of February 14, these headlines read in part (our italics):

"Single Cart *is* Used for Hauling Corpses
Food, Offal and Beef. The Dead
*are* Buried Without Ceremony."

And, in the body of the article, it is said:

"The representative of the Times-Picayune has witnessed the ruthlessness of a mob; he has watched the frenzy of lynchers. These can be accounted for. But the inhumane treatment meted out to the pauper dead, to feeble-minded individuals and the state insane, makes the other picture pale from indignant recollection. The countenancing of such wrongs speaks volumes. That they were permitted at any time in any civilization tells of an unbelievable callousness of soul. * * * There existed at the Jackson asylum a morgue cart. It was a simple crude affair. It was put to many uses. * * * The same wagon in which was carted the wet, soiled, unsanitary mattresses, from the filthiest of filthy hospital wards, was used" to carry "the corpses of the dead house to the shallow graves. * * * Not alone, in this respect, was Dr. Pierson callous. When an unfortunate insane dies at Jackson, all interest in him absolutely ceases. There is no attempt at religious service. The body is placed in a rude box. A shallow grave is dug by insane patients. An underling sees the corpse interred. The rude box is placed in the grave. The earth is covered over the body. That is all. Not a 'God be with you' is spoken. No prayer is raised. No clergyman is summoned. No more ceremony is observed with the poor unfortunate than if it were a hog that had died, while being fattened. The course is identical. Sometimes they go to more trouble with the hog. They burn it. * * * But the Times-Picayune will give its readers another glimpse into conditions at Jackson, and still another custom which warrants its indictment of Dr. Pierson.

"When a patient dies in that institution, and his, or her, body is unclaimed, it is removed to the dead house. There it is cut up. There it is dissected. There it is examined. This has been done, with the knowledge of Dr. Pierson. It has been done so often that it has become a custom. That it is a heinous wrong does not seem to have occurred to Dr. Pierson. That it constitutes another example of official inefficiency, carelessness, inhumanity and callousness is stated as a fact and presented for public consideration. '* * *'"

The entire article fills about four solid columns, and the style is much the same throughout. There is some pretense that because, in referring to the cart, the article reads:

"There * * * existed * * * a morgue cart. * * * It *was* put to many uses," etc.

It reads in the past tense. But, if so, why was it written? The investigator was sent to investigate matters requiring remedies; why should he fill the columns of the paper with ghastly descriptions of conditions for which remedies were provided years before he appeared? The pretense is false. The article speaks to the ordinary reader as of the time of the investigation, and was so intended. The headline reads: "Single Cart *is* Used for Hauling Corpses." The undisputed facts

are that in its early, and even later, days, the asylum lacked many things that it should have had, but we find no reason to suppose that, with a board of administrators charged with the duty of providing them, when supplied with money appropriated by the General Assembly, it has ever been considered obligatory on the superintendent to supply such deficiencies from his meager salary. Among the things which were perhaps needed was a hearse, but none had been provided, prior to the time when Dr. Pierson became superintendent; and the same is true as to many other things. The evidence shows that during the first few years of his incumbency many things of more urgent importance than the building of a hearse were accomplished, and that in the meantime, the vehicles possessed by the asylum were used rather indiscriminately for the different purposes for which vehicles are required. It is likely, therefore, that a cart, or wagon (he speaks of both), was used at times to convey the dead to the cemetery and at other times for other purposes; the use of the cart having been probably more frequent than the use of a wagon. But in 1911, four years before Mr. Leppert appeared, a hearse was built, and since then the dead have been conveyed to their graves in no other vehicle. The statement that they are put in a "crude box" creates an erroneous impression, and it can hardly be denied that it was so intended, for it reads, "The body *is* placed in a crude box," whereas since 1911 the dead have been put into wooden boxes, to be sure, but they are in the shape of coffins, and appropriately painted. The adjectives "filthiest of filthy," as applied to any ward that Mr. Leppert found at the asylum, are viciously and maliciously misapplied, as there were no such wards. And the same may be said of the description of the burials and the statement that—

"No more care is observed with the poor unfortunate than if it were a hog that had died while being fattened. The course is identical. Sometimes they go to more trouble with the hog; they burn it."

It is shown that Mr. Leppert never saw a burial at the asylum, or even the cemetery in which they take place; that the funerals are usually conducted under the direction of a subordinate official, who has a number of men subject to his orders, and the witness called by defendant to testify upon the subject was one of them, a man who was brought from Mississippi to give his testimony, who had been employed by Dr. Pierson between 1909 and 1913, and promoted from the position of attendant to that of supervisor. His connection with the asylum had been severed in 1913, and he had made several applications to be re-employed, without success. He was unable to say how deep the graves were, save those dug under his supervision, which were four feet. He attended funerals unless he was off duty; he did the best he was able to do, and supposes they would be called decent burials. It was his duty, as supervisor, to see, generally and especially, that things were properly attended to, and to report those that were not. He had some five men who were subject to his orders. Religious ceremonies at funerals were rare, and he supposed they had them when requested by relations. It is beyond dispute that the graves are marked with headboards (possibly stones) bearing the names of the decedents, and numbers corresponding to numbers borne by them on the books of the asylum, so that they may easily be identified. If the graves dug under his supervision were too shallow his testimony shows that it was he, and not Dr. Pierson, who failed in his duty. It is shown that there were no regular ministers stationed at Jackson and no chaplain at the asylum; that two of the ministers have, at times, held funeral services, which were attended by Dr. and Mrs. Pierson; that a priest visits the asylum about three times a month, but

evidently it is uncertain whether priest or minister can be found upon short notice. The published statement that the dead were dissected is shown to be false; hence the subsequent statement attributing to Dr. Pierson "official inefficiency, carelessness, inhumanity, and callousness" on account of such dissections is an aggravated falsehood.

The headline charge, amplified in the article of February 16, contains statements to the effect that the insane in the asylum at Jackson are virtually isolated, at the mercy of flames, and that the responsibility and imagined consequences that may result are to be attributed to the negligence of Dr. Clarence Pierson, the superintendent, which is a gross and willful misrepresentation of the real situation.

The affairs of the asylum, as we have stated, are not only confided to the board, created and authorized by law, but are and have been, during Dr. Pierson's incumbency, as superintendent, administered by the board. Mr. West, who has been vice president of the board for a number of years, and chairman of its executive committee, gives the following testimony on that subject, to wit:

"Q. Who is the manager of the East Louisiana hospital for the insane at Jackson? A. The board of administrators. Q. What part has Dr. Clarence Pierson had in it? A. He has been the executive head, to carry out the orders of the board of administrators. Q. What power has he had over the board of administrators? A. No power; they carry out his recommendations, or turn them down. Q. Do you mean that the board of administrators has the absolute management of the affairs of the institution? A. Yes, sir; it has."

It is shown, without attempt at contradiction, that the members of the board have been appointed from among the best, the most prominent, and the most successful citizens of the state, in mercantile, agricultural, and professional pursuits; that the meetings of the board and of the executive committee have never been without quorums; Mr. West, during 12 years of his membership on that committee, though engaged in both banking and farming, having missed but two or three of its monthly meetings, and having been in almost daily communication with the superintendent.

It is shown that when Dr. Pierson was elected superintendent the asylum was inadequately supplied with water for its ordinary requirements, and for that reason and perhaps from motives of economy, that it was the custom to allow the steam to go down in the power house and to cut off both heat and light from the wards at 9:30 o'clock at night, leaving but a few lanterns, which served to make the darkness visible; that upon Dr. Pierson's initiative, the board caused the first artesian well to be drilled that had ever been known in that section of the state, from which, since then, an abundant supply of water has been furnished for all ordinary purposes; and that a standpipe has been erected, from which, and by means of hose attachments connecting also directly with the well, water may be thrown upon all parts of the buildings in which the wards are situated.

The minutes of the board show (and defendants' investigator spent much of his time in reading them) that Dr. Pierson has frequently called the attention of the board to the fact that, abundant as is the water supply, for ordinary purposes, it might prove insufficient in the event the building should take fire, and has recommended the building of a concrete reservoir of 1,000,000 gallons capacity as a provision against that contingency. In the meanwhile the matter has been called to the attention of the General Assembly by the board, and by the Fire Warden, for fire prevention bureau, and the buildings have been accepted by the insurance companies.

In the meanwhile, also, the board has adopted the policy of using concrete in replacing the ground floors and foundations of

the old, and in the construction of new, buildings, with a view, eventually, of making them both fire and rat proof; of providing apartments where the "untidy" patients, many of whom are as helpless as infants, and more difficult to care for (requiring complete changes of all that they wear several times in the course of a day), may be kept in decent condition, and may readily be removed in case of fire; and, incidentally, of utilizing extensive gravel pits, which the asylum owns, and the labor of many patients who are able-bodied men, white and black, accustomed to manual labor and for whom outdoor occupation is the best and, perhaps the only, remedy which holds out any hope of improving their condition.

Patients, other than those assigned to the "untidy wards," have been taught to "fall in" at the command "Line up," and by actual experiment have been removed into the open air, from the third (and highest) floors within three or four minutes. Fifty per cent. or more of the separate apartments (or wards) in which they had previously been confined, from the foundation of the asylum, had been converted into dormitories, in which heat (in cold weather) and light and attendance are maintained night and day, steam being kept up at the power house, with engineers on watch at all times, so that the danger of fire originating in the buildings, or attaining any considerable headway before being discovered, has been greatly reduced, and will be further reduced as the dormitory system is extended and completed, which will be as rapidly as money can be found for that purpose.

A vast deal of misplaced emphasis has been attributed, in connection with supposed danger from fire, to the alleged neglect of Dr. Pierson to provide fire escapes, and upon that subject Mr. West (who is corroborated by ex-Governor Sanders, and other witnesses, and whom no witness attempts to contradict) gives the following testimony (being asked why fire escapes were not installed) to wit:

"We have 50 to 60 buildings, and it would cost anywhere from $25,000 to $40,000, and I don't see how we could get out of it to-day for less. ·Q. You have studied the proposition? A. Oh, yes; fully. * *. * Q. It would require certain remodeling inside? A. Yes, sir; remodeling—inside and outside work too. Q. Is it the fault of Dr. Pierson that this has not been done? A. Not at all; no, sir. Q. Whose fault is it? A. The fault of the board—not having the money—but not Dr. Pierson. A. Besides the board, whose fault? A. The Legislature of the state. Q. For not having the money? A. Yes, sir; for not appropriating the money. * * * Q. Your appropriation was increased in 1914? A. Yes, sir. Q. Why didn't you apply that? A. We had to use it for the maintenance of the institution. When Dr. Pierson went there, our population was 1,300. When Mr. Leppert was making this so-called investigation, our population was 1,600. I am giving round numbers—and we had to use the appropriation to take care of the people, and, as all know, the high cost of living has increased our expenses."

Being asked what the board had found itself able to do beyond the maintenance of the inmates, he mentioned as a few, among the many, things: The changing of wards into dormitories; the painting of the buildings and the repair of roofs, the cost of which was very heavy; the erection of a new power house, at a cost of $15,000. To which we may, at this time, add a few more betterments, and still not exhaust the list, to wit, reinforced concrete smokestack; reinforced concrete tunnel, to hold all piping, wires, etc.; superintendent's cottage; removal of railroad and rebuilding 3,270 feet of new track to connect with power plant; erection and maintenance of sanitary toilets and bathrooms in white male hospital; erection of reinforced concrete base for hoghouse; erection and installation of new cold storage rooms; demolition of old cold storage rooms; erection of kitchen and equipment for same; erection of fireproof vault in office; remov-

ing and remodeling colored male hospital; remodeling colored female hospital; installation of new terra cotta drain from hydro department; repairing gardener's cottage; erection of new implement house; purchase and erection of iron fence in front of hospital; erection of depots for motor cars; general repairs to windows, doors, screens, etc.; rearrangement of center, or administration, building with different offices, receiving parlors, male and female; conversion of basement of annex building into administrative dining rooms; artesian well; removal of boilers and machinery from old to new power house; 1,000 feet of new hose; conversion of sewerage from pumping to gravity flow, saving $6 to $8 per day fuel bill; extension of water main to new power house and cottage of superintendent; purchase of pump for pumping water into standpipe; fitting up power plant at colony; installation of electric lights in criminal building and colony No. 1, etc.

By the testimony of still other witnesses, it is shown that there has been some difference of opinion among the administrators as to the feasibility of fire escapes, of any known design, as a means of escape for a large body of lunatics, in the excitement of a conflagration, since, so far as we are informed, it would be necessary for them to proceed singly, in the event of a fire, and to so arrange the apparatus as to prevent their obtaining access to it when there is no fire.

From all of which it appears that a body of men whom our Governors, having the entire intelligence, honesty, and experience of the state to choose from, have, during a period of 10 years, selected to administer the affairs of an asylum, containing from, say, 1,350 to 1,650 insane persons and 200 officials and employees, a body of men who, in all other respects, appear to have vindicated the wisdom of their selection, have so discharged their duties as not to earn the approval

of Mr. Leppert, or his employer, but that they have, nevertheless, escaped defendant's criticism, while their executive officer has been published to the world as callous, inhumane, criminally negligent, and generally unfit for his position because he has obeyed their instructions and the law which required such obedience. It seems evident, therefore, that the criticism to which we have referred, even if it were just and fair from any point of view, has fallen in the wrong place; but, as we have stated, the critics have shown no qualifications for that office, and the criticism, founded in a malicious and self-serving motive, is unjust and unfair.

Mr. Moore testifies that he was never inside of an insane asylum in his life, and he admits that he failed to avail himself of an invitation that was extended to him to visit the asylum here in question, though he had made up his mind to publish the attack on its superintendent upon which this suit is predicated. He also admits that he has paid but few visits to asylums of any kind, and he did not pretend to any knowledge or experience of, or in, the management of such institutions. He testifies that he selected Mr. Leppert to make the investigation because he had known him a long time and considered him well-equipped for that service; that he instructed him to call on the administrators and superintendent and cooperate with them, and make his investigation thorough and fair. We do not gather from his testimony that Mr. Leppert informed him that it was not his intention to obey these instructions, but we are of opinion that he had a fair opportunity to discover, before sanctioning the publications here in question, that they had not been obeyed in any respect. As we see the matter, therefore, Mr. Moore was mistaken, as to Mr. Leppert's qualifications in regard to the first and fundamental requisite of a proper equip-

ment for such an investigation as he was instructed to make; for his motive and purpose precluded an investigation that could be either thorough or fair. Apart from that, and notwithstanding the fact that he boasted to Yost of his 25 years' experience in making investigations, told him that he was getting $175 a month, and that his success in his then enterprise meant a steady job, in the Times-Picayune, his home and his plantation, we find, from his own testimony, that he had no experience whatever in investigations; that prior to his visit to the local detention hospital in New Orleans he, like Mr. Moore, had never seen the inside of an asylum where the insane were housed; that his salary from the Times-Picayune was not $175 a month, but considerably less; and that he had no other assurance of a permanent job than the vague statement, in answer to his inquiry on that point, that there was always an opening on the Times-Picayune.

His testimony, as to his prior experience in life and his employment by defendant was substantially as follows: That he was born in New Orleans and educated in the public schools and the Jesuits College (where he was connected with a college paper); that in 1885, he became a professional newspaper man, as an employee of the Times-Democrat, in which employ he remained (with the exception of a period of service in the Spanish-American war) until 1901, when he and others acquired the New Orleans Item, upon which paper he worked until it changed ownership, when he engaged in farming and the sawmill business in Alabama, so remaining for nearly 14 years, and, having then lost his means, through the boll weevil, and having three grown persons and four children dependent on him, he returned to New Orleans and at the suggestion of a friend, whom he met on the street in August, 1915, applied for employment with the Times-

Picayune, and was employed to make the investigation here in question at a salary of $30 a week, and the privilege of signing his own articles.

On his cross-examination, he testified that, when he became connected with the Item, Mr. O'Malley was the publisher, and paid him his salary; that at the end of six or eight months O'Malley sold the paper to Thalheimer and Palmer, by whom he was retained and given a stock interest, "to put him on a parity with the publishers"; that the arrangement lasted until the paper failed and "passed back into O'Malley's hands," a period of "probably a year," during which he was managing editor. His testimony fails to make it clear that he then left, or was left out of, the employment of the Item; but he says that *when* he left that employment he engaged in business in Alabama and when that business failed he was employed by the Times-Picayune, as already stated. It will be seen, therefore, that the witness is by no means exact in stating dates and periods of service, since if he worked for the Times-Democrat until 1901, then spent 14 years in Alabama, and in August, 1915, was open to the suggestion which he states was then made to him to enter the service of the Times-Picayune, there was no time left for his experience with the Item. On the other hand, if that experience extended over a longer period than he has testified to, and he retained his position after the paper had passed again into the hands of O'Malley and until it again passed out of his hands, and into those of the present owner, he may very well have been connected with it in September, 1904, when an article was published on account of which the publisher was condemned to pay $5,000 as damages for libeling the then District Attorney (Luzenberg v. O'Malley, 116 La. 699, 41 South. 41), or even so late as June, 1905, when an article was published for which O'Malley was convicted

(State v. O'Malley, 115 La. 1005, 40 South. 470) upon a criminal charge of libel, though he testified that he knew nothing about the publication, for which he was convicted; it being shown that he was part owner and controlled the policy of the paper. Be that as it may, the facts remain that Mr. Leppert had achieved no particular success in anything that he had undertaken, prior to his employment by defendant, and that, conceding that he had, at that time, attained a high position as a newspaper man (as Mr. Moore testifies), his value, as such, was fixed by that employment at $30 a week. We, therefore, find nothing in his experience, of either failure or success, in other lines of activity, to warrant the conclusion, reached by Mr. Moore, that he was especially equipped to make a thorough and fair investigation of an insane asylum, or to proceed to prosecute, convict, and sentence the plaintiff herein without giving him an opportunity to be heard. Neither his qualifications, nor those of Mr. Moore, by whom the sentence was executed, were any better, as it appears to us, than would be those of a layman, having no experience of such business, who should walk into a factory, or a hotel or a newspaper office, conducted by persons of equal intelligence and far more experience, and, upon the basis of data obtained from lunatics and discharged and dissatisfied employees, assume to suggest to such persons how their respective businesses should be conducted, and then denounce them for not adopting the suggestions so made. There is, of course, a difference between the rights of a newspaper in the matter of criticising public and private institutions, but, so far as we can see, there should be no difference in the qualifications of the self-appointed critic who undertakes to make a thorough and fair investigation, whether the institution or the business investigated be public or private. In either case the criticism should be based upon the truth, undistorted, and should be fair, not malicious or self-serving.

Notwithstanding that the questions of fire prevention and fire escapes were within the jurisdiction of, and were acted on by, the board of administrators, and were no more to be decided by plaintiff than by defendants' editor and manager, or its investigator, and notwithstanding that defendant disclaims any intentions to enter into "harrowing details," its investigator, for lack of facts, has taxed his imagination to produce, and defendant has thought proper to publish, the following lurid description of a condition which, it is suggested, might be brought about in the event of fire, and for which, it said, plaintiff (and not the board or the state) would be responsible, to wit:

"Through the lines upon lines of windows, up the many, many stairways, the tongues of livid flame will then leap up, the fire will greedily lick up the pine floors, the pine partitions, the pine joists and rafters. The old walls will creak, seemingly in devilish glee, as though a mighty devil were cracking his knuckles while he waited to clutch the seared souls of the insane. And the poor palsied epileptics, stricken by the horror of their surroundings, will fall to a glowing bed of coals and shriekingly writhe to an undeserved end. The maniac will run from place to place shouting in hellish glee. His voice will vie with the mighty voice of singeing flame, which will seem to cry out as an echo to the demoniac screams. The idiot and imbecile will sit nodding in the corner, on a chair, or in a corridor, and, with lack luster eyes, he will nod a welcome to the red handed flame that reaches out for him. He will drink in the hot breath of death and he too will pass from life to a cinder. The loss will be all but total. The grief will be great and state-wide. The responsibility for the holocaust that might at any time occur would rest upon Dr. Clarence Pierson, superintendent of the institution, who has, for ten years, been so forgetful of the needs of his patients that he has provided no fire escapes; that he has, in no wise, complied with the law; has spent lavishly on nonessentials, when, at any time, the institution may be swept away in smoke."

Considering that the means of fire prevention and fire escape are infinitely better since plaintiff was made superintendent of the asylum than they had ever before been during the nearly three quarters of a century that the institution has been in existence, and considering that the power to do more than has been done is vested in the state, and the board, and not in plaintiff, it appears to us that the last sentence of the above excerpt is singularly inconsistent, unjust, and malicious, and that the specification of the power house as a nonessential is infelicitous. The evident purpose of the description is to harrow the feelings of those having relatives and friends in the asylum, and excite their resentment and indignation against the person whom the writer charges with the entire responsibility, for the suddenly discovered peril, to which such relatives and friends are said to be subjected, and whom the concluding sentence, in terms, declares to be Dr. Clarence Pierson, "who has, for ten years, been so forgetful of the needs of his patients that he has provided no fire escapes," etc. It is not altogether surprising, in view of such a publication, and others of a similar character, that one of the administrators should have heard a passenger in a street car express the opinion that Dr. Pierson should be driven out of the state; and it seems deplorable that a person capable of writing such matter should be given access to the columns of a newspaper, and actually paid even $30 a week for its production.

In the same article (February 16th), under the front page headings:

"Unfortunate Inmates Forced to Huddle Together on Concrete Floor of Wards.

"Inadequate Heating Arrangements in Large Rooms with Broken Windows Through Which Chilly Winds Blow. Dr. Pierson Gives Out Statement Asking Suspension of Public Judgment for the Present."

—the investigator has produced about four columns of solid matter, based partly on the "dope" that he brought with him and, otherwise, imaginative. We excerpt the following therefrom.

"The wards were cold; the wind whistled through broken windows. The fog like chilly drizzle penetrated a healthy man's bones. Without even reasonable heat, half a hundred idiots were found on the bare, cold cement floor, in what is called the 'Untidy Ward.' There they sat, half a hundred men, in the coarse bluish gray uniforms, made union suit fashion. There they sat, cold, barefooted and shivering. The attendants were doing all they could. All that the institution provided was given these unfortunate wards of Louisiana. These are untidy patients. It is difficult to keep them shod. It is hard to keep them clean, but God knows it is no harder to keep them warm than it is to keep a Holstein cow bedded deep in hay. * * *

"The lights go out in the wards at 10 o'clock. The unfortunate insane, whether restless, sleepy, or wide awake, are left to their disturbed or wild hallucinations and are locked in their cell like rooms. Out into the coal black of night they peer and wait, and wait for sleep. And the foraging rat slyly creeps out from his home between the walls and floors, and his beady eyes fix upon the patient. In search of food, he rambles here and there. Beneath bed, into the corner, across the floor. An end of a blanket trails from a cot. Up this trailing stairway, the rodent nimbly runs, and about the patient he seems to play. His cold feet and nose touch hand and limb and face and throat of the miserable human derelict whose people permitted him to become an inmate in the belief that Louisiana's wards would be properly cared for.

"It is small wonder that an insane person at Jackson remains incurable with the nightly nightmare of a rodent's visit and the fear of the rodent's teeth embedded in the flesh. * * *

"When one man made the bold statement that the bedding was vermin infested and when his statement was given but half hearted belief, an employee added his testimony that the man spoke the truth and that one patient had amused himself with threading bed bugs on a string.

"There is no need to deny the presence of roaches. The Times-Picayune man saw them for himself. They were present in all the variety of roach age, size and virility.

"It is an unquestioned fact that rats roam throughout the institution. The age of the old buildings is possibly an excuse for their presence. There are thousands of them about the institution.

"The policy of waste of food stuff, the absence of systematic rat baiting and the throwing about of food make for the continuance of the rat pest."

The first of the above excerpts, read with the headings, conveys the impression that the investigator found all of the wards cold, with chilling winds whistling through broken windows, and that the condition so described was the usual one to be found in the wards on a chilly day, which is about as true as would be a statement concerning the condition in any other institution, on a particular day, when an accident had just disabled the heating apparatus, and, while the head of the institution was engaged in an effort to repair the damage, a lunatic had broken the windows, since that was the real condition of the Jackson asylum, as the investigator knew, though he did not think proper to mention it in his article.

He practically admits the necessity for paving the untidy wards with concrete; he admits that there was a cocoa rug upon the floor, and gives its approximate size, but does not give the size of the floor, so that the reader is unable to determine the proportion left uncovered. It is shown that the windows to which he refers were broken by the demented lady whose letters contributed part of his "dope," from which we should infer that they were the windows of the ward in which she was confined, and not the untidy ward; but from the language of the article it might be thought that the breakage occurred in that ward, or that the windows in all the wards were broken. The truth is, that, having erected a new power house, the board had been installing new and more effective machinery, and that, by reason of the burning out of grate bars, or some other accident, the heating apparatus happened to have been disabled, or partially disabled, on the occasion of the investigator's first visit,

and that steps were then being taken to repair the damage. Upon a second visit, which he paid afterwards, the representative of the board who accompanied him, carried a thermometer, and, as the temperature of the ward, or wards, was found to be comfortable the investigator did not mention that visit in his article, but left the erroneous impression, created by the description of the first visit uncorrected.

The comparison between the condition of the untidy patients and the "Holstein cow, bedded in hay" appeals neither to common sense nor common fairness, since an accident might have deprived the cow of the hay, as it deprived the patients of their warm air, and the fact that the hay was provided for the cow had no connection with the temporary disablement of the apparatus which deprived the patients of the air. The farm colony, including the dairy and the Holstein cows, is shown to have been maintained to the pecuniary profit of the asylum and the very great benefit of all of its patients, and if the administrators had not taken proper care of valuable cows which were furnishing the patients with milk, it would probably have been suggested that they and the patients should change places.

There is some testimony, mainly that of Mr. Leppert and of Dr. Cooper, to the effect that many of the nozzles (intended to be attached, in the event of fire, to the lengths of hose which were distributed about the institution) were not in position for prompt use; that there was an absence of "spanners" (or spanner wrenches) used to attach the nozzles to the hose, and, perhaps, the hose to the water pipes; that some extinguishers had not been filled within the delay prescribed by the directions as to their use. It is impossible to determine from the testimony what proportion of the whole number of nozzles or extinguishers that were kept on the premises,

were subject to that criticism. Mr. Leppert gives the following (with other testimony covering several hundred pages) to wit:

"The morning of the second visit [meaning December 2, 1915], I had found things that did not indicate the cleanliness of a hound's tooth; I remarked to Dr. Evans, 'If you will come with me, I will show you some things that ought to be corrected,' and he came along with me while we [Dr. Cooper and himself] were going along. These matters of hose and nozzles and fire extinguishers and lack of drill were constant topics of conversation. I asked one of the attendants, 'Where is your nozzle?' and he said: 'It is in the linen room.' I said: 'Are you quite sure?' He said: 'Sure, in the linen room, or the room next to it.' I remarked to Dr. Evans: 'It is a fifty-fifty chance; I'll just make a bet with you that he don't get the nozzle.' He opened the door and the nozzle was not there; it was in the room next door."

As we understand the testimony, the attendant opened the door of the linen room and the nozzle not being there, he found it, as he had said he would, in the room next to it; and it appears to us that Mr. Leppert lost his bet. Nozzles and spanners are heavy pieces of metal, which, if left lying about, within constant and easy reach of the patients might readily tempt them, under the influence of sudden insane impulses, to use them in battering out each other's brains. The nozzles, as it appears, are therefore kept, under lock and key, in the linen rooms, or the rooms next door. The spanners, as the chief engineer testifies, are kept hung up in a fixed place in the power house, where he or his assistants are on watch, ready to use them, at all times, night and day, and it was his opinion that the disposition thus made of them met all the requirements of the situation. The question, therefore, is not one of negligence, but of competent or incompetent judgment. The chief engineer, who knew more about the danger of fire—having been employed at the asylum for many years, also testifies that Mr. Leppert never asked him for any information during the whole period of his investigation. Mr. Leppert concedes that the drilling of insane people would be hardly practicable, but alleges that it was negligence not to drill the attendants.

The chief engineer testifies that he instructs the attendants from time to time as to the use of the extinguishers (all that is necessary for their effective operation being to turn them upside down); and, as we have stated, patients had been taught to fall in and attend meals in such order that they could be taken out of the upper wards, and the buildings, within four minutes. Beyond that, the matters to which we have thus referred are details of administration which a superintendent might very well be expected to leave to his subordinates. Dr. Cooper had been assistant, and first assistant, physician for 5 years, and it appears to us that he, rather than Dr. Pierson, should be held responsible for failing to see that nozzles, spanners, hose, valve wheels, and extinguishers were not, each of them, kept in fixed positions and ready for use; and that, in testifying in regard to those matters he was establishing his own, rather than Dr. Pierson's, negligence. The negligence, in our opinion, was, however, slight, and not likely to have led to any serious consequences. That Mr. Leppert may have found things that did not indicate "the cleanliness of a hound's 'tooth" is quite possible; such things may be found almost anywhere by a meticulous investigator who is anxious to find them. Two gentlemen who were sent up by Moore, at Leppert's request, made an inspection under Leppert's guidance, and in their written report to Mr. Moore, had only this to say upon the subject of cleanliness, to wit, "Beds, bedding and floors clean." And we imagine that, if their guide knew anything that was so unclean as to merit attention, he would not have allowed it to escape them.

The imaginary rat, with the beady eyes and the cold feet, described in the second

excerpt, becomes more shadowy when the investigator descends to the realms of fact and gives his testimony under the obligation of his oath as a witness. He says that he saw but four rats during the almost three months that he was engaged in his investigation—all dead and in traps, and that he never saw either a roach or a bedbug. He seemed not to know, and was given the information, that the city of New Orleans had been made almost rat-proof by the expenditure, with the government of the United States, of some $3,000,000, and that the use of concrete was the principal factor in that work. There is not a syllable in the record to sustain the assertion, contained in the last sentence of the excerpt, to the effect that more insane persons remain incurable in the Jackson asylum than in any other asylum in the country, and the proven fact is quite to the contrary. The stories that the investigator repeats as coming from unnamed persons, to the effect that the bedding of the patients was vermin-infested, and that one of the patients amused himself by threading bedbugs on a string, are given much the same effect, in the manner of their repetition and publication, as though they were founded upon facts within the knowledge of the investigator. And yet he had nearly three months within which to find out by personal investigation that they were false, certainly with reference to the condition that he found, and as we think probable with reference to any previous condition; and he called neither the tellers of the stories nor any one else to verify them. On the other hand, the lady housekeeper testified that the beds and bedding are scrupulously inspected once a week, and are kept free from vermin; and Mr. Sutton, who had had considerable experience as superintendent of an orphan asylum and was sent up (with Mr. Goldman) about the 8th or 9th of December, 1915, reported and testified that the beds and bedding were clean, as did also Dr. Herring,

an expert of national experience and reputation, who made several inspections, as agent of a national organization devoted to the care of the insane, and at the request of the then Governor of the state.

The sworn statement of the investigator that he saw neither roaches nor bedbugs, and but four rats, all dead, in traps, though he was looking for such things, might, we think with no violation of general ethics, have been included in the articles that were sent in for publication, but they were not. He wrote in the excerpt last above quoted that he saw roaches "in all the variety of roach age, size and virility," and we are at a loss to understand how, 2 years later, he could swear as a witness that he never saw a roach in all the time that he was investigating; also that he saw none but the four dead rats, in traps. that we have mentioned; and yet, according to the excerpt, it "was an unquestioned fact that rats roam throughout the institution," and that there were "thousands of them about the institution."

Upon the basis of observation and experience, we should say that, until New Orleans was made almost rat-proof, a few years ago, it is likely that there were few inhabited places in Louisiana, or, possibly in the United States, where no rats could be found, and still fewer where there are no roaches. But, so far as the record in this case discloses, vermin of that description were no more numerous at the Jackson asylum than in any single institution in this state, or elsewhere, in which so many human beings are housed and fed.

The last paragraph of the excerpt to which we are now referring seems to have been taken from the whole cloth. If there is any evidence of absence of systematic rat baiting, waste of foodstuff, or throwing about of food, we fail to recall it. It is shown, without attempt at contradiction, that rats are caught in traps (the investigator saw them in traps,

dead, and not elsewhere), and one of the purposes of concreting the buildings is to eliminate them. It is also shown that waste food and garbage is collected and put carefully into a vehicle made for the purpose, and consisting of a metal container, with a tight-fitting lid, or cover, in which it is hauled to the farm colony, three miles distant from the asylum, where it furnishes a large proportion of the food consumed by hogs which are there raised and fattened, in a concrete building, and which are eaten by the patients, or shipped and sold beyond the limits of the state for their benefit.

In connection with the subject of food, we find in the record the following tribute to the new kitchen, which was completed, and the equipments of which were installed or ready for installation, while defendant's investigator was engaged in his work, but which received no attention and no mention from him. Mr. Dudley, the storekeeper of the asylum, testifying, to wit:

"It is the best I have ever seen. Q. In your judgment, it is something really worth looking at? A. Indeed it is; I think it one of the show places of the institution; a beautiful white-tiled floor and steam cook copper kettles, and things of that kind; big range. Q. Kept in immaculate order, isn't it? A. Yes. Q. Screened? A. Yes, all screened; all latched."

Which tribute is fully corroborated and wholly unchallenged. And we may add thereto that it is shown that the walls of the kitchen are glazed; that the superintendent employs a high-class cook, from New Orleans or Chicago, at high wages, with several assistants; that some of the lady employees give their attention to the maintenance of the described condition and the preparation and service of the food; and that a number of the patients render such assistance as they are competent to render; it being always understood that many of them are accustomed to work of that character, enjoy the occupation, and are benefited by it.

It is further shown that at that time there were on hand, ready for use, covered containers in which to carry the food from the kitchen to the dining room, with the tables, to be heated by steam, upon which it was to be kept warm during meals, and that the only reason why the installation had not been completed was that the engineers had been kept busy installing the new machinery in the new power house, all of which information the investigator thought proper to suppress.

Concerning the article of February 17, headed:

"Dangling Ropes Tempt
State's Insane Charges
to Commit Suicide.

"Ropes are Found Within Easy Reach of
Dr. Pierson's Patients

"Monotonous Diet of Food Exposed to Infection During Transfer from Kitchen to Dining Room and Eaten by Patients Without Aid of Knives Compares But Poorly with Epicurean Delicacies on Table of $9,800.00 Cottage"

—the evidence shows that the question of finding some substitute, within their means, for the ropes, miscalled "Dangling," has, time and again, occupied the attention of the administrators, and that they have, often, for reasons which they concluded were controlling, decided to make no change in the ropes. Whilst, then, nothing more is required to show that the charge that Dr. Pierson is responsible for the retention of the ropes is false and malicious, it is but common justice to state the situation as it is, in order to acquit the administrators of negligence, and show that they have acted in the matter after due consideration:

The windows, it is said, are numbered by the thousands: The so-called "Dangling Ropes" are ropes, each of which is attached by one end to the upper edge of the lower sash of a window, and the other end of which is then passed through a pulley attached to

the lower side of the top of the window frame; thence, through the iron grating which is fastened to the window frame, to prevent the escape of the patients, down upon the inside of the grating (meaning the side facing the ward or dormitory), through the grating again, and through another pulley, as we infer, and is then attached to the lower bar of the lower sash, so that, by pulling down upon the rope (which is a window cord), the lower sash can be raised, and by pulling up it can be lowered. It is not denied that it becomes necessary, at times, to raise and lower the sash. It is not denied that it is necessary to maintain the grating, inside of the sash, in order to prevent the patient from jumping out of the windows. It is shown and not disputed that the ropes, arranged as thus described, were there long before Dr. Pierson was made superintendent; and it is admitted that several patients have hanged themselves with them. The estimated cost of making changes, which, while maintaining the gratings will leave it possible to raise and lower the sashes, is something like $40,000, and the administrators have never had that amount which could be used in that way. They, however, at the time of the investigation here in question and prior thereto, had adopted the practice of quartering all patients who could be suspected of suicidal tendencies in the dormitories, where, with attendants on guard and plenty of light at all times, none of them could hang themselves without interruption.

As to the alleged monotony of the diet: The patients appear to be supplied with beef, pork, bacon, grits, syrup, and the groceries that other people require; all, or nearly all, of the vegetables that they can eat, fresh and in great variety, from the farm, and otherwise by purchase at competitive biddings; as also large quantities of milk, of the best quality, from the farm dairy, and the in-

vestigator, under the headings, "Food Well Cooked," and "No Hot Dishes," writes (in the article now under consideration), "As a general proposition, however, the food is sufficient in quantity and well cooked," to which we add that we find the bills of fare about as varied, and, perhaps more varied, than in most households in the country; that the evidence does not show that the investigator, at any time, entered the dining room during a meal, whether to look at the fare served to the patients or to participate therein; and we conclude that all that he has written on that subject has been derived from other persons whose names he does not give, save, perhaps, in the case of a young married man named Anderson, who was content to work at the asylum at $22 a month, but who left his position and was shortly afterwards employed by defendant at $50 a month, gave his testimony while so employed, and whom we find unworthy of belief.

It is shown that some of the patients eat without knives because they cannot be trusted with them, and are furnished with spoons; those who can be so trusted being provided with knives.

The comparison between the fare of the patients and the "Epicurean Delicacies on Table in $9,800.00 Cottage" seems to be founded in ignorance and malice. Until within a year prior to the appearance of the investigator, Dr. Pierson, his family and his staff, lived in the same building, upon the same fare, and were served from the same kitchen, as the patients. Mr. Leppert declined an invitation to dine at the $9,800 cottage, and had no knowledge of the character of the fare with which its occupants are provided.

As to the cost of the cottage, it is shown that, in the better regulated asylums, the superintendents, being required to be men of family, are generally provided with separate

residences, some of them much more costly than the one in question, and that, in respect to that cottage, the administrators, of their own initiative, concluded that it was unfair to Dr. Pierson that he should be obliged to live and rear his children in the midst of demented people, and not enjoy the privilege common to most men in this country of giving himself and his family the privacy and comfort of a home, and the erection and cost of the cottage were matters which were ordered and determined by the board, without Dr. Pierson's intervention—all of which was, or might have been, known to the investigator, before he wrote his article, if he had intended to be fair and truthful.

The front page heading of the article of February 14 reads, as we have stated:

"Insane Girl put Under Knife for Kinswoman of Dr. Pierson, B. S., M. D.

"Helpless Ward of State Subjected to Operation Without Even Benefit of Full Anæsthesia—Small Cart is Used for Hauling Corpses, Food, Offal and Beef. The Dead are Buried Without Ceremony.

There is no statement in the heading thus quoted that is not either malignantly false, or a perversion of the truth. The girl described as "Insane" is not so classified by competent authority, and would not have been in the Jackson asylum if the asylum for the feeble-minded, since established, had ben established at that time, for she is classified as "high-grade feeble-minded," possessing sufficient intelligence to enable her to understand the simple things of life, express her likes and dislikes concerning them, and to consent or object to those which concern her, as they meet with her approval or otherwise. The person referred to as a "Kinswoman of Dr. Pierson, B. S., M. D." was not a woman; she was a little delicate girl between 7 and 8 years of age, whose back had been terribly burned, leaving a con-

siderable area perfectly raw, after several attempts at skin grafting had failed; nor, strictly speaking, was she the "kin" of Dr. Pierson; she was the niece of his wife. The letters, "B. S., M. D.," which are paraded after his name, represent university degrees earned by Dr. Pierson, but, as thus paraded, are manifestly intended by way of ridicule. The statement, "Helpless Ward of the State Subjected to Operation Without Even Benefit of Full Anæsthesia," ignores the facts that the girl gave her cheerful, and as we conclude from the evidence competent, consent to the transfer from one of her thighs to the raw back of the little sufferer, of certain small strips, or pieces of the superficial layer of the skin, known as the epidermis, or cuticle, the operation, so far as she was concerned, being painless and absolutely harmless, and leaving a mark or scar amounting to nothing more than a slight difference between the color of the spot from which the removal was made and the adjacent area. It is shown, without attempt at contradiction, that the local anæsthesia was proper in the case, and that full anæsthesia was absolutely essential in the case of the burned child, whose raw back it was necessary to scrape off with curettes, an operation which, without such anæsthesia, would inflict unendurable agony.

The addition, to the heading concerning the operation in question, of the false and malicious statement, "Single Cart is Used for Hauling Corpses, Feed, Offal," etc., appears to us to have been made with a view of uniting two charges, which, if true, as embroidered by the writer, would thereby attract greater attention and excite greater hostility towards Dr. Pierson than if made separately.

The front page display heading of February 15 is obnoxious, to much the same criticism. It reads:

"Pierson Disregards
Professional Ethics
in Jackson Asylum.

"Superintendent Fails to Protect Patients
Left in his Charge.

"Canny and Cunning Evasions and Adroitness
Adopted by Him in Attempt to Block
Thorough Investigation of Conditions
At State Hospital."

We find from the evidence to which we shall refer, that the investigator was as incompetent to determine any question of ethics, professional or otherwise, involved in this case, as he was to conduct a thorough and fair investigation; and we should feel disposed to criticize Dr. Pierson for giving instructions agreeably to which he (the investigator) sought to have the thigh of the patient to whom the heading refers exposed a second time to his inspection, and to the inspection of the two other representatives of the defendant whom he caused to be sent to his aid, were it not that, at that time, the matter had been, practically, taken out of the hands of Dr. Pierson, by the resolution of the executive committee of December 8, 1915. As the matter stands, the asylum authorities did not go far enough in protecting the patient in question from the unethical acts and conduct of the investigator; and the repeated statement that Dr. Pierson resorted to any canny and cunning evasions and adroitness in the attempt to block investigation is shown to be untrue.

From the introductory passages, or prologue, to the article of Monday, February 15, 1915, we excerpt the following:

"The Times-Picayune expressed the conviction Sunday that Dr. Clarence Pierson, B. S., M. D., was unworthy to be the Head of the State Asylum for the Insane at Jackson La.

"That conviction was forced after a three months investigation into the conditions surrounding the insane and feeble minded wards of Louisiana, and after a painstaking contrasting of conditions in this state with those in Mississippi and Alabama. * * *

"On Sunday we printed the promise that, from day to day, would be printed some of the salient features of the investigation and that a brief beginning would be made in the work of correcting a great public wrong.

"To-day will be printed some of the many facts that warrant the assertion that Dr. Pierson is, at heart, cruel, callous, inhumane by temperament and unfitted to hold an office wherein kindliness, respect for conventional decencies and consideration for the rights and welfare of his patients are prime essentials."

On page 7 of the paper (to which the article is continued from the first page) the attention of the public is attracted by the subheading in large capitals:

"Skin Stripped from Insane Girl at Jackson
Charge"

—and in the course of the article it is charged that the operation constituted a violation of the statute denouncing the crime of mayhem and, after some further passages, it is said: "And now for the details of this skinning operation," after which and the statement that the girl was brought into the operating room, the writer undertakes to give the following, among other details, as though he knew them to be true, to wit:

"She was told to get upon the table. She was told that a minor operation was about to be performed and she was gently cozened into quietude. With no appreciation of what was being done, Fannie —— [as we may call her] lay with a look of blankness in her open eyes. From her right thigh was stripped the skin in flitches, and placed upon the wounded back of the little etherized patient. Quickly though the surgeons had worked, the penetrative power of pain was more potent than the local anæsthesia, and into the eyes of the unfortunate insane girl there welled up tears forced by the final consciousness of her pain long deadened. She moaned a little. She cried a little. She was soothed and she was carried to the hospital. Her outraged body had been mangled. A defacing wound had been put upon her fair flesh. An alleged liberty had been taken with an unfortunate ward of Louisiana by its servants who were paid to see to her comfort."

We pause here to observe that among the things which, at his request were ex-

hibited to the investigator prior to the arrival of Dr. Pierson at the asylum, was the right thigh of the "unfortunate ward of the state," and that, a week later, when the two social or child's welfare workers who were sent up by Mr. Moore arrived upon the scene, the investigator did not hesitate to request that the "defacing wound" be subjected to another inspection for their edification. The visitors, however, not considering it proper to avail themselves of the opportunity thus afforded, declined to look at the wound, or scar. As we read the testimony, the investigator felt no such compunction, and did not hesitate to describe the horror of the girl at the prospect of being again exhibited, and, ignoring the exhibition made for his benefit only a week before, attributes her feeling to the operation which had been performed more than two years before, whereas it was of him and the strange men by whom he was accompanied that she was in dread. Thus, we read in the article now under consideration, the following:

"Girl Fears Doctors Now.

"Cursed with an arrested mentality though she be, Fannie ——— is still fearful of a doctor's touch. When the Times-Picayune representative sought to investigate the girl about the matter, Mr. (Dr.) Holbrook, now the chief assistant, approached her. Through a corridor and into a passage way the young girl lightly darted. Dr. Holbrook tried to soothe her terror. She cried out in her alarm, tried to wrench herself free from his grasp, and, shuddering from head to foot, finally dropped into a seat, grasped the back of the chair and laughed crazily and hysterically.

"Indeed, so greatly was she unstrung, so fierce her determination that she would not again be handled, that her cries rang down the corridors of the female ward and impressed every man in the party more strongly than words can tell."

Mr. Sutton, one of the visitors whom Mr. Leppert was accompanying on the tour, and who declined to witness the proposed exhibition, being called to the stand as a witness for defendant, gave the following, with other, testimony, to wit:

"I am superintendent of the Society for the Relief of Destitute Orphan Boys. * * * I do some 'social work' in the city of New Orleans and in the state."

He recalled having made a visit to the Jackson asylum on December 9, 1915, in company with Mr. Julius Goldman, Superintendent of the Jewish Charitable and Educational Federation, and at the request of Mr. D. D. Moore. He went through the asylum with Mr. Leppert, Mr. Goldman, and Dr. Holbrook. He says that—

Before they left the committee room, Mr. Leppert "asked that we go and see * * * the one skin had been taken from. Q. Did you see it? A. No, sir; I refused. Q. On what account? A. I didn't think I had the right to look at the girl in that condition. Q. You told him so? A. Yes, sir. Q. What did he say? A. I don't remember his answer. Q. You didn't look at the little girl's thigh? A. No, sir. Q. What was the young girl doing when you went there? A. She was standing, if I remember correctly, in the hall with the nurse, Miss Carney, when I first saw her. * * * She started away when we came up, and Dr. Holbrook laid his hand on her and sat her down in a chair. Q. What happened then? A. Nothing; I talked to the nurse. * * * Q. You had Fannie ——— in front of you? A. Yes, sir. Q. Sitting down in front of you? A. Yes, sir. Q. Have you told the jury everything that happened on that occasion? A. As far as I know; yes, sir. Q. And you cannot recall anything else that Fannie ——— did or said at that time? A. Well, she got childish, and didn't talk to us, and didn't look at us. Q. She wanted to get away. Q. Now, think hard; can't you think of anything else she did? A. No, sir. Q. And if she had done anything else, or said anything else, you would have remembered it? A. I might not, because I was talking to the nurse at the time. Q. I judge, turning to your comment under the head 'general' [referring to comment in written report made by witness and Goldman to Moore], that, having criticized so few things, you found the institution rather in good shape, didn't you? A. All things considered, we did."

At a later period in his cross-examination the witness gave the following testimony:

"Q. Now, I ask you to think for me, if you can, what Fannie —— did that day; did she cry? A. No, sir; she possibly whined like a little child, when you catch hold of them. Q. I want to read you something that Leppert wrote and published about it," and counsel reads the first paragraph of the excerpt from Leppert's testimony, which we have reproduced, and asked the witness: "What do you say to that? A. I didn't see that, to that extent." Counsel then reads the second paragraph of the excerpt and asks: "Did you hear any of that? A. No, I didn't hear it. Q. And what did happen you have told us here? A. Yes, sir. Q. When Leppert went and tried to get that young girl to expose her thigh for you to see—is that right? A. Yes, sir. Q. You saw that? A. Yes, sir. Q. And you declined to look at it? A. Yes, sir."

. Dr. Holbrook, who was examined under commission, gave the following, with other, testimony:

"Mr. Leppert did try to obtain a second examination of Fannie ——'s limb. This was on the occasion of the visit of Dr. Sutton and Mr. Julius Goldman. * * * I was piloting. * * * At this time Mr. Leppert asked that Fannie —— be exposed, that he might show her limb to these two gentlemen, and he asked that I arrange for this examination. As this was an unusual request I asked them to wait until I could consult Dr. Pierson on this matter, and, after I saw Dr. Pierson, and he said to me to do anything that Dr. Sutton and Mr. Goldman wished. I then went and sent one of the young lady employees to find and bring Fannie —— to the treatment room. While the attendant was looking for the patient, Mr. Leppert, Dr. Sutton, Mr. Goldman, and myself walked down ward 2, towards the treatment room. As we were about halfway down the ward Fannie —— accidentally came by, and I spoke to her and told her we wanted to see her for a few minutes. She saw Mr. Leppert and the other gentleman, and, no doubt, realizing that we wanted to expose her again, she began to run. I took three or four steps forward and caught her, and she sat in the chair and began to whimper. She hid her face in her hands and cried from embarrassment and shocked modesty. She would not go to the treatment room, and resisted all efforts so strenuously that Dr. Sutton and Mr. Goldman asked out of consideration for the patient that we [should] not insist upon the examination. * * * Fannie —— did pro-

test and object to the exposure of her limb to Dr. Sutton and Mr. Goldman, but did not run screaming down the corridor on the approach of myself, but she cried because of humiliation and modesty when she realized that she was again to be exposed to the gaze of strangers."

On his cross-examination the witness testified as follows:

"I was not present when Fannie —— was first exposed to Mr. Leppert's investigation, but, when he attempted to expose her leg a second time, in the presence of Mr. Goldman and Dr. Sutton and myself, she objected strenuously. * * * As far as I know Fannie —— has never been exposed for examination to a layman, but has been examined by several physicians, namely, Dr. Herring, Dr. Batcheler, Dr. Lea."

The underlying facts involved in the question here presented are as follows:

Prior to 1918, the laws of this state provided that indigent insane persons might be sent by the courts, after proper investigation, to the state asylums at Jackson and Pineville, respectively, but they made no provision for idiots, imbeciles, epileptics, or the feeble-minded, and it was not until the enactment of Act 141 of 1918 that a "State Colony and Training School" for the feeble-minded was established. For lack of any other place to send them, therefore, indigents of all the classes mentioned were sent to the insane asylums; and some 5 years prior to Mr. Leppert's visit there had been sent to the Jackson asylum, by the civil district court for the parish of Orleans, three little girls, of whom two were soon taken out by relatives, leaving the third, whom no one claimed and of whom no relatives have ever been discovered, notwithstanding repeated effort in that behalf. The child was probably 12 or 13 years of age at that time, and was pretty, healthy, cheerful, and amiable. She could not properly be classified as an insane person, but belonged in the class described as "high-grade feeble-minded"; her mind

having, apparently, ceased developing, so that at the age of 12 or 13 she possessed about the intelligence of a child of 5 or 6 years. Judging from what is said of her and from her testimony, given on the trial of this case, she must have improved as the years passed, since she is shown to have been able to understand a great deal that would be beyond the comprehension of a child of that age, as, for instance, in the matter of dressing herself, the care of her person, and her deportment under circumstances which might well embarrass a normal girl of her own age and inexperience. It is evident, we think, that in 1913, when the operation in question was performed, she was capable of appreciating kindness and of entertaining a feeling of gratitude and of satisfaction in being able to make some return therefor. If the question here presented were whether she was capable of giving her consent to anything which would have subjected her to appreciable suffering, physical or mental, or would have deprived her of any right, or of any property, or would, in any way, have militated to her prejudice, that question should probably be decided in the negative. But it appears to us that the real question is whether, because of her position as a ward of the state, in the custody of Dr. Pierson, and as his patient, it was either his duty or his right to deny her the privilege of gratifying her own feelings towards people who had been kind to her and towards a litle girl with whom she had associated and held in affectionate regard, by submitting to a 'minor operation, which, while entailing nothing worse than a pin prick in the way of suffering, but trifling inconvenience, and no harmful effect whatever to herself, would relieve the little girl of intense pain, endured for months, and, perhaps save her life. The case would hardly have been different if the girl had become an expert and powerful swimmer, as she might well have done, and having proved her capacity to rescue others from watery graves, had been confronted with the alternative of so rescuing a playmate to whom and to whose family she was attached, or of standing idly by and allowing her to drown, because, it might be argued, the superintendent of the asylum would abuse the trust reposed in him, as a state officer, should he solicit, or accept, the consent of one of his "unfortunate wards" to perform an act of common humanity, and, perhaps, save a human life, even though it should cost her nothing and would give her greater pleasure than anything that he could do for her; and because, as a physician, dealing with a patient, it would be violation of some rule of professional etiquette for him to permit his patient to perform such an act for the benefit of a child with whom he might be connected by blood or marriage.

Recurring to the facts: It appears from the evidence that at the time the operation in question was performed, Dr. Pierson, with his wife and children, lived on the second floor of the "central," or "administration," building of the asylum, it being a three-story building, flanked on either side by other buildings, connected with the central building, and constituting the white female and male wards, respectively. His children, save the smaller ones, took their meals in the dining room, which, with the offices, was on the first floor, and the members of the staff (assistant physicians, etc.) ate with them, as did also such guests as visited the family, including Mrs. Pierson's married sister and her children, who paid them visits from year to year. The assistant physicians, and probably other members of the staff, were quartered on the third floor. The apartments of the Piersons were open to the access of patients whose mental condition permitted such liberty, and many of the female patients were in the habit of going in and out of their rooms every day; Fannie ———— being

one of those who were free of the place and exercised her privilege at all times, thereby acquiring almost the status of a member of the family, and associating and playing with Mrs. Pierson's children and the children who visited them, including a litle girl, Nellie, who was Mrs. Pierson's niece. In 1912, Nellie was severely burned upon her back, the skin being entirely destroyed upon quite a considerable area, so that the only remedy promising any prospect of its restoration was thought to be the process of grafting upon the burned area the skin of some other person, and that was several times attempted, but without success, so that, when the child's mother brought her to visit Mrs. Pierson in 1913 her back was in the condition and had the appearance of raw beef. The question of grafting was again brought up, and one of the assistant physicians stated that he would be glad to perform the operation. The child's mother had previously, on two occasions, contributed, from her arms and shoulders, the bits of epidermis, or cuticle, considered necessary for the operations, and other relatives had done likewise; but the operations had failed. Mrs. Pierson, therefore, suggested that she should contribute in that way, but she was thought ineligible, because she was at that time nursing a baby, and some of the young women patients, who were in and out of Mrs. Pierson's rooms were taken into consideration, not, at all, as we understand, with a view of levying any tribute on thém, without their consent, but because it was thought that they were capable of giving and would willingly give their consent, the reason for selecting Fannie ———— being explained by Mrs. Pierson, in her testimony, as follows:

"When Fannie came to the institution, she was a poor motherless little thing—a perfect tramp, I took pity on her; she came with two others, like herself, of her age, I put them so I could watch them and care for them and do everything I could for them. I changed their clothing and gave them attractive little dresses. They were with me all the time, and they were with my children, and like one of my children all the time. She was the playmate of my child Louisa. Fannie is very affectionate, and if you don't notice her she will make you notice her; rather than run from you she will run to you; and she considered it more an honor to give the skin to Nellie. Q. She knew Nellie before Nellie was hurt? A. Oh, yes. * * *

"Q. It has been testified that a list of names was made up, covering Fannie ———— and others; do you know anything about it? A. Yes; a list of names of that class of people who were about the same age at the time, and who were with me at the time. Q. They were all girls, or young women, who had been around you, like Fannie? A. Yes, sir; in and out of my room all day long. Q. Do you know who, finally, settled on Fannie, out of the half dozen who were considered; do you know anything about the reason? A. Yes; she was so willing and glad, Mr. Dart."

Mrs. Pierson's testimony is corroborated by that of a number of witnesses, who are wholly uncontradicted, and who further testify that Fannie has always expressed herself as being proud and happy that she was able to do what she did for her suffering little friend. As to the subject and character of the operation, it appears that—

The skin "in vertebrates * * is composed of two layers. The outer, the *epidermis* (which see), or *cuticle*, is composed of stratified ectodermal epithelium, and is *without nerves or blood vessels*. Only the deeper layers of cells of the epidermis are capable of growth. The more superficial layers usually change into horny material and wear away, or are cast off little by little, *as in man*, or they may be shed, as a coherent membrane, as in snakes." Web. New Int. Dic. Verbo, Skin.

Dr. J. W. Batcheler, dean of the Medical College of Tulane University; surgical chief of surgical division No. 1 of the Charity Hospital, and formerly, for 13 years, house surgeon; also, for 3 years, a teacher of surgery, describes the operation of skin grafting as follows:

"The skin grafting operation is, to begin with, very minor. It is an operation concern-

ing which very definite rules are laid down. What we call the classified minor operation in grafting the skin. The skin, as a whole, is not cut out, contrary to what you might expect; if the entire skin is cut, to be grafted, it won't take. The operation consists in *merely shaving the superficial layer of the skin with a sharp knife.* * * * In doing such an operation, the patient's sensitiveness is put in abeyance either by a general anæsthetic, *which is rarely resorted to, or by the use of a local anæsthesia,*" etc. (Italics by court.)

The testimony so given is abundantly corroborated and wholly unchallenged; and it is further shown that what defendant's article calls "full anæsthesia" was not required, and would not have been proper in Fannie's case; that, while she may have uttered some little sounds, now and then, she was really subjected to nothing that could be called suffering during the operation, which was, in every respect, scientifically performed; that she was carefully attended to afterwards, and within a week or 10 days had entirely recovered, with nothing to show for the operation but a very slight, superficial scar.

Concerning the ethics of the operation, we quote the testimony on cross-examination of Dr. Batcheler, than whom no surgeon stands higher in the estimation of the people of this city, to wit:

"Q. Doctor, do you know of any case in the Charity Hospital where a patient was taken, without their consent, to give any skin to be grafted on some one else? A. No, sir; I can't recall. Q. Doctor, would it be ethical for a physician in charge of that asylum to take one of the patients and subject them to such an operation without their being willing and consenting to it? A. I would not consider it ethical. Q. Getting down to this insane asylum, and getting nearer home to Fannie ———, in her condition is it ethical to take that child [By present writer—Fannie was 19 or 20 years old at the time of the operation] to the operating rooms of that institution and remove that skin, do you think? A. Not without her consent. Q. The girl, being insane, of course, could give no consent? A. I have not passed as an alienist on her case.

"By Mr. Dart (plaintiff's counsel): You have the same views as other men? A. My personal view, to be perfectly frank with you, is that the entire proceeding was entirely ethical; I don't think any damage was done her at all. Q. Did you talk to her regarding the operation? A. Yes, I did. Q. What did she tell you? (Objection and ruling.) A. I did question her; you understand—you may not understand—but it is a fact that among reputable physicians the code of ethics is very strictly observed. When I went to Jackson, although Dr. Pierson is a warm personal friend of mine, he knew that if I found things other than as represented, I would testify to it. I questioned the girl with a view of finding out whether she was unduly influenced, because simple-minded people are subject to undue influence. She seemed to be very much of a pet up there. I asked her, to begin with, so as to form my own conclusions, what her preparations were and how she got into the operation room, and she said on a stretcher. I asked her if she was kept in bed afterwards, and she said she was, for several days. I asked her about the dressing applied before and after the operation, and she gave me the same satisfactory answers. (I want to say she was not coached in my presence.) I asked her if she consented to this operation, and she said yes. I asked if it pained her, and she said no. Now I am not trying to put forward any facts that may not be just as they appeared to be on the surface, but I think she was honest in her replies."

No attempt was made to contradict the testimony of Dr. Batcheler, in any particular, or to show that Fannie did not, in fact, willingly consent to the operations or, for lack of intelligence, was incapable of consenting; the sole reliance of defendant, to support the argument of incapacity, being that she was committed to an insane asylum as an insane person, which reliance, for reasons that have been stated, and others that might be stated were it not that we are beginning to hope that we may reach the end of this opinion, we do not think meets the requirements of the occasion.

On the other hand, the testimony of Dr. Batcheler is corroborated by that of others, including Dr. Herring, to whom we have referred and shall again refer; by the circumstances that the operation was performed

by a reputable physician, member of the asylum staff, assisted by another member of the staff and another reputable physician, not a member of the staff, in the presence of Dr. Pierson, his wife, sister-in-law, and a trained nurse; and that, during the trial in the district court, long after the publication of the libel here in question and of various efforts by Dr. Pierson to obtain redress, through the courts, had become matters of general discussion, Dr. Pierson was elected president of the medical association of the parish in which he resided, and, so far as we are informed, may occupy that position at the present time.

Apart from all that, the word "ethics" is defined as:

"1. The science of right conduct and character; the science which treats of the nature and grounds of moral obligation, and the rules which ought to determine conduct in accordance with the obligation; the doctrine of man's duty in respect to himself and the rights of others. * * *

"3. A particular system of principles and rules concerning moral obligations and regard to the rights of others, whether true or false; rules of practice in respect to a single class of human actions and duties; as social ethics; medical ethics," etc. Century Dic. & Enc. Verbo, "Ethics."

And we can conceive of no principle of right conduct and character, no moral obligation, no doctrine with respect to man's duty to himself and the rights of others, which can, properly, be invoked to condemn the action taken by the plaintiff in this case. On the other hand, plaintiff's accuser, whom defendant employed as a well-equipped investigator of the ethical and other aspects of the matters charged by him, appears to have acted upon the theory that, in the particular lexicon with reference to the definition of which he regulates his own conduct, the word "ethics" has no more place than the word "fail," otherwise he could never, merely in order to "get" Dr. Pierson, have even sought to compel a girl whom he considered

148 LA.—29

mentally deficient to expose her person to his inspection.

The top lines, in the largest type found in the paper of February 18, 1915 (save the title), reads:

"Accounts of Asylum
Checked by Auditor
Conditions Sorrowful."

From which one would suppose that the investigator had found the pecuniary affairs of the asylum in a deplorable condition upon the occasion of his visit, requiring immediate action, and would hardly imagine that the "sorrowful conditions" thus referred to had been officially reported to the Governor and acted on, so far as action was considered necessary, 5 years before the investigator appeared, and that, instead of obtaining his information from the auditor's report, or some other official source, he had taken it from a campaign document, which "fluttered in on him," he says, and which was issued in 1915 in support of the opposition to Dr. Pierson's incipient candidacy for the gubernatorial nomination. Considering the charges in the article in the light of the evidence in the case, we find that they relate to trifling errors which were long since corrected, and deserve no further notice. We also find that since 1910 the books of the asylum have been audited about three times a year, found correct, and the results reported to the General Assembly at its biennial sessions. The article of February 19, in its headlines, charges plaintiff with enjoying luxuries and autos at the state's expense, with traveling widely and failing to "dock" himself for his absences, and with neglecting his patients.

"The story has been told [reads the article, on the first page] how Dr. Pierson stocked his private cellars with choice wines and champagnes for the use of his friends and for the use of his family, and the story has been told how these state-bought goods were used for the general entertaining of his kindred who seemed always on prolonged and constant visits to the state institution."

It will be noted that the heading of the article states it, as a fact, in large letters, that "Dr. Pierson enjoyed luxuries and autos at state expense," and that in the body of the article it is said, "The story has been told," etc. The record does not disclose the names of the tellers of the stories, but the evidence shows that, no matter whether told or invented, they were untrue, the facts being that Dr. Pierson at no time has had a private cellar, and that the three or four bottles of wine that were in the cold storage room of the asylum, and had long been there, in charge of the housekeeper, were kept for the use of the patients, or for emergencies when wine would be needed. There is no evidence that any of it was used by Dr. Pierson, his family or friends, save that, on one occasion, champagne was administered to his mother, an old lady, and it is thought to have saved her life. The reference to the autos is trying to one's patience. An automobile was purchased upon the order of the board of administrators, by the chairman of the executive committee, and was much needed; the railway station being 3 miles away, and patients, officers, and employees constantly coming and going; the parish seat being further away still; the home of the chairman of the executive committee being some 10 or 12 miles distant, his visits to the asylum frequent, and he being, at least, entitled to transportation, and, as we infer, not being provided with an automobile of his own. Also, there was frequent communication between the asylum and the farm colony and between the asylum and the building in which the criminally insane are housed. It might with equal sense and decency have been charged, with the implication of graft, that the patients, transported from the station to the asylum, were enjoying an auto at the expense of the state. And the charge against plaintiff, as made, is one of the many which refute the argument, upon which

defendant seems much to have relied throughout the case, that (quoting from counsel's brief):

"If the facts commented upon and criticized are truthful, then there can be no libel, even if the deductions therefrom in the articles lie like hell,"—

the words "lie like hell," being quoted from the admission of plaintiff's counsel to which reference is made in the early part of this opinion.

It is charged that Dr. Pierson was absent from the asylum for seven months, during the year 1915, engaged in canvassing for the gubernatorial nomination, and the headline reads, in part:

"Institution and Insane Patients Neglected While Servant of State Was Away from Post."

The charge is shown to be untrue. Plaintiff was absent during the period mentioned for 32 days, of which 30 days were included in a leave of absence granted him by the board of administrators; it having been the custom of the board to grant leaves, varying in duration, annually, to all officers and employees who requested them, and Dr. Pierson having rarely made such request, perhaps not more than once or twice during his 10 years of service.

Under the display heading of the article of February 20 which reads:

"Slight Increase in Number of Insane Costs State, Heavily."

—the text reads (quoting in part):

"It can be seen that, during the ten years of Dr. Pierson's incumbency, the population increased 130 patients while the appropriation increased not less than $110,000.00 per annum. In other words, it takes $110,000.00 to care for 130 patients."

Mr. Rice, a respected merchant of New Orleans, and a member of the executive committee of the asylum board, referring to the charge so made, says, in his testimony:

"The deduction that the public would make, and the general inference from that write-up, was that somebody used that difference. * * * No effort was made by Mr. Leppert to account for this $110,000. * * * Fair criticism would show what disposition was made of that money. He never intimated for an instant that all manner of supplies had advanced 40 per cent. * * * He left the public to believe that some one 'had swiped the money.' "

Mr. West, banker and farmer, vice president of the board and chairman of the executive committee, being cross-examined by defendant's counsel, gave the following, with other, testimony, to wit:

"What is wrong about it, Mr. Lemle, is that Mr. Leppert did not finish stating the facts. If he wanted the facts in the matter, he would have stated that this money was spent for buildings and different things; and if he had done that it would have been all right, but he didn't. * * * Q. It is not, as I gather—I again repeat, so there will be no mistake—that the effect on your mind was, not from what you read, but, knowing the situation, you were affected because the article omitted to say something that you thought it should contain? A. The way the whole article read, Mr. Lemle, it affected me. * * * Q. I ask you to state to the jury by what process, in all fairness—leaving out your institution, for the time being—that, if a newspaper came out to-morrow and would say that the Charity Hospital got an appropriation last year of $160,000 (I am talking in round numbers) and in 1917 the hospital got $300,000, and that the increase of patients in the hospital was only 15, do you think, as a fair-minded man, from that, that the public would have the right to infer that somebody was stealing the money? A. Yes: I would, unless they told them what they used the money for. Mr. Leppert could have found that out just as easy as you are now. Q. Yes; I know it; but isn't it a matter for some one else to investigate? Isn't it the duty of the paper to bring it to the attention, whether it be your board, or the people of the State, or the Governor, to determine what became of the money, whether it was being used for the building of houses or other things? A. The Governor knew what it was being used for; Mr. Leppert could have found out."

According to the theory of the learned counsel, if a man were to rush into a burning building, and, finding a woman lying unconscious upon the second floor, were to attempt to save her life, by means of a ladder, accessible from a window, but should himself be overcome by flame and smoke, and, failing to reach the ground, and dropping the woman, they should both be killed, it would be perfectly fair and legitimate for a newspaper to publish the bare fact, truthful as far as it went, that the woman was killed by being dropped by the man from a second story window. The counsel's theory seems to us, however, to be inapplicable to the particular publication here in question. If it had been intended to convey the idea that the entire expenditure of the asylum for all purposes had suddenly increased by $110,000 from one year to another, it might have suggested an inquiry as to the occasion of the increase, though, if the writer knew that it had become necessary by reason of the destruction of one of the wards, by fire or cyclone, it would hardly be considered fair to withhold a statement to that effect. But it was the manifest intention of the publication here in question to convey the impression that the administrators had spent $110,000 for the maintenance of 130 patients, whereas, say, 1,600 patients, or more had previously been maintained, under the same conditions, for, say, $170,000. "In other words [reads the article] it takes $110,000.00 to care for 130 patients." The figures themselves are, however, given by the investigator with singular indifference to their accuracy; the facts (to which defendant's learned counsel attach such importance, and which we think are entitled to proper consideration) being that during the 10 years of Dr. Pierson's incumbency the population of the asylum was increased by about 300 patients (and not 130, as stated by the investi-

gator), and that the total annual appropriation was increased to $250,000, to which were added receipts from other sources. The expenditures for repairs, betterments, etc., during the 1916–1918 period (the greater part of which had expired prior to the publication here in question), on the other hand, far exceeded those of any similar period; and the investigator might have obtained, if he did not obtain, accurate figures by the mere asking, or by an inspection of the published and bound reports which the administrators of the asylum have made, biennially, to the General Assembly in which all the money received has been accounted for.

The article now under consideration (that of February 20), contains, also, the charges that "coal consumption runs up threefold under the Pierson régime." The books show the charge to be untrue, the annual cost of coal, stated in round figures, having varied, between 1905 and 1916, inclusive, as follows: $12,000; $12,000, $11,000, $14,000, $15,000, $14,000, $13,000, $11,000, $14,000, $19,000, $22,000, $13,000, the cost of both the coal and the transportation being higher during 1914 ($19,000) and 1915 ($22,000) because of the war. Moreover, Dr. Pierson did not buy the coal; it was bought under sealed and competitive bids, as were all other supplies, by the board of administrators. The statement, in the body of the article, that more was paid for the asylum coal than was paid by a private contractor, is also shown to be untrue, by the testimony and contract of the contractor.

It is charged that the population of the asylum was padded, in the reports, the basis of that charge being the fact that the names of patients who were given furloughs were kept on the rolls. There was no attempt to show the number of patients so dealt with —whether 1 or 100, or how long they were away, or how they were to have been provided for in the event of an appropriation after their names were taken off the rolls and their return before the next appropriation.

The subheading reads, in part, "How Improvements Paid for by the State are Cast Away?" and the public is informed in the body of the article that indoor telephones which had been established had been removed, and that—

"he [Dr. Pierson] is rather hard upon the young girls who want to chat with one another over the inter-communicating phone system, and prohibits any engagements being made between the young men and the young women in the institution."

It may be that the investigator, who had never been in such an institution before, could manage the Jackson Asylum better than the administrators, whom the state has put in charge, and their superintendent, but we have found no reason to think so.

It is charged that there was a costly experiment in railroading and the responsibility therefor is attributed to Dr. Pierson; and there follows a tissue of falsehoods in which the railroads and an auto truck and the sale of the truck are confused unwarrantably. The then Governor of the state, now in Congress, gives the following testimony in regard to the purchase of the road:

"Q. I omitted to call your mind back to another thing, Governor; that institution is served by a railroad? A. Yes; it was served by a little railroad that runs from McManus to the institution, owned by a corporation; that was when I was Governor. The principal traffic that it had was between McManus and the Jackson insane asylum; the other traffic amounting to nothing. Q. Did the institution acquire it? A. Yes; we bought that railroad. Q. Why? A. Because it was absolutely essential; we were paying freight, and rather a large sum for freight; we figured out we could get the railroad and serve the asylum with it a whole lot cheaper than we could by paying freight. Q. I believe I can go further and say that it was your personal initiative and effort to acquire that road? A. Yes; the

proposition was this: The railroad was about to discontinue, failed to make any money, and it was about to throw up the sponge and quit. The institution is situated several miles from the Y. & M. V. R. R., and a large amount of freight is hauled into that institution annually; bulk weights, coal and things of that kind. To have to haul that coal from the railroad to the institution, by dirt road, would absolutely have put the finances of the institution on an impossible basis; so we bought the road, and, to the best of my knowledge and belief, the buying of that road has been a good investment to the institution, saving money every year for the institution," etc.

The testimony so given is fully corroborated and wholly uncontradicted.

Another section of the headline in question reads, "Land Bought for Six Times its Assessed Value," which statement, taken literally and alone, is true, and yet it is just the reverse of the truth in so far as it purports to convey a correct impression of the matter to which it refers. The investigator fails to mention that, a few years ago, there were many thousands of acres of land in Louisiana that could be sold for six times the amounts for which they were assessed; that, while the land in question was bought for $20 an acre, other land, in the same vicinity, and no better brought $25 an acre. He also fails to mention that there was a building on the land that was worth more than the price paid for the land, and, particularly, to the asylum, since one of the purposes in making the purchase was to relieve the congestion at the asylum and provide quarters, removed therefrom, where many of the able-bodied patients, white and black, accustomed to outdoor manual labor, could find an opportunity to work off some of their otherwise pent-up energy and restlessness, and, incidentally, or perhaps, as another main purpose, to establish a farm for the production of vegetables, cattle, and milk for the benefit of the inmates of the asylum. It is only necessary to add that the farm and the dairy established on the land so acquired have shown a profit, considerably exceeding the cost of the land; and that they have, besides, relieved the asylum proper of perhaps 100 of its patients, thus making much needed room for an equal number, confined in jails throughout the state, and affording occupation to those who are so fortunate as to be able to work on the farm, which is said to be the best remedy for their ailments.

The remaining headline charge in the article of February 20 reads, "Shrinkage in Beef Buying," and, upon that text, the investigator has given some testimony, of a general character, relating to allowances for shrinkage that should be required in the buying of beef, but we fail to find that it has any particular relevancy to any purchases made in behalf of the asylum, and it certainly fails to show that the asylum has lost, or is likely to lose, anything through such purchases.

Defendant attempted to prove but few of the charges contained in its answer. It is shown that at the time of the investigation a patient named Jurgelwiez was quartered in a new building which, after several years of persistent effort, the asylum authorities had obtained the money to erect for the secure holding of the "criminal insane," as they are called, meaning those who, being charged with crime, escape the penalty therefor by pleading insanity, and are committed to the asylum.

It is said that he had committed what, for a sane man, would have been a cold-blooded murder; his plea of insanity having been sustained he was sent to Jackson asylum, at a time when there was no proper provision for the keeping of such people; for he was then, as he has always been since, an able-bodied man, who seemed obsessed with the desire to kill and who constantly announced his intention, should he succeed in getting out, to kill those who had participated in sending him to the asylum and keeping him there. Somewhat later that intention was

expressed towards Dr. Pierson and his family, more particularly his little boy—in shouts from Jurgelwiez's window directed to every one who came in sight, and which included also the use of the vilest and filthiest language that it is possible to conceive, addressed especially to the female. inmates who came within the sound of his voice. In order, probably, to prevent his reaching the window, and in view of the fact that he, once or twice, by means that were never discovered, managed to relieve himself of his shackles, and escape, to the terror of the neighborhood, he was finally more securely shackled, and was provided at night with an oblong crib, perfectly ventilated, and having a lid which could be, and was, locked. A year or more prior to the investigation here in question, Jurgelwiez was transferred, in robust health, to the new "criminal insane" building, where his shackles were removed, and, if the investigator saw him, at all, he found him enjoying all the liberty and freedom of action that could be granted without setting him at large. It may be stated that there was another patient, a negro named Napoleon, who had also committed a homicide, which, but for his insanity, might perhaps have been called murder, and to whom, as we infer, such liberty was accorded as defendant seems, to think should have been accorded Jurgelwiez, with the result that Napoleon walked into the rooms of two of the patients in the asylum and killed them with billets of wood; and it may be that the asylum authorities would be liable to the charge of negligence in his case, though we are not sufficiently advised of the circumstances to so hold, nor would it be relevant here, since the issue is not raised, but we are not persuaded that the treatment of Jurgelwiez was other than as the circumstances required. Dr. Cooper and another witness were of a different opinion, but they were largely in the minority, were not threatened and had no

families or little boys, which makes a difference.

It is shown that when Dr. Pierson was made superintendent of the asylum, about one-third of the patients were subjected to actual personal restraint of one kind or another, some of the older employees testifying to quite a variety of appliances and methods then in use for that purpose, and it is also shown that, when the "criminal insane" building was made ready for occupancy, Jurgelwiez and Napoleon were the only patients to whose persons any such restraint was applied.

It is shown that, in the absence of Dr. Pierson from the asylum, one of the assistant physicians found it necessary to amputate a patient's leg, which was infected with cancer; and it is said that full anæsthesia was not administered, and that the leg was thrown into the furnace at the power house, instead of being buried. The evidence satisfies us that all the anæsthesia was administered that was proper under the circumstances and is unconvincing as to the burning of the leg; but, whether it was burned or buried, we think, was immaterial; the former owner, for aught that appears, made no complaint, and may have preferred that it be cremated.

There is some testimony by a disgruntled ex-employee, to the effect that a patient was scalded while being bathed by another patient and was thereafter neglected and died; but there is more credible testimony to the effect that the patient who was bathing the other was competent and that the scalding was not her fault, but was an accident resulting from the eccentric action of the heating apparatus, which was subsequently changed so as, automatically, to regulate the heat of the water. The charge of neglect is disproved, and Dr. Pierson is shown to have known nothing of the matter. Such testimony as may have been adduced in support

of other charges in the answer appears unworthy of serious consideration, and, in most instances, no supporting testimony was offered.

While the investigation here in question was in progress, there happened to come to this state Dr. Arthur P. Herring, a gentleman who, for many years, has devoted himself to the study of questions concerning the care and treatment of the insane and the management of insane asylums. He came South at the instance of the medical director of the National Committee on Mental Hygiene, of New York, a committee established for the purpose of improving the care and treatment of the insane, "to ascertain the actual conditions under which patients are treated, and, if need be, to make recommendations which would improve the conditions in the institutions and thereby bring the care and treatment of the insane up to a higher standard," and his qualifications for that service had been acquired in various positions, including the following, to wit: Associate professor of neurology at the Baltimore Medical College of Physicians and Surgeons; associate in neurology for 8 years, at Johns Hopkins Medical School; visiting physician to the Department of the Insane at the City Detention Hospital (Baltimore); neurologist in chief at St. Agnes Hospital; visiting physician to the Neurological Out-Patient Department in Johns Hopkins Hospital; special field agent for the National Committee on Mental Hygiene. At the time that he testified he was secretary of the State Lunacy Commission of Maryland, having direct supervision of five state asylums and fourteen private asylums for the insane, containing over 7,000 patients, his special duty being to visit the hospitals and see that the patients are kindly treated, and to supervise the business management and everything relating to the care and treatment of the insane. He had previously visited Louisiana as the field agent of the National Committee above mentioned, to investigate the condition of the insane, whether in asylums, detention hospitals, or jails, and had come again on the same mission. Having heard of the investigation and intended publication by the Times-Picayune, he called upon Mr. Moore, editor-manager, and represented to him (quoting the testimony of Mr. Moore) that—

"Any publication in a newspaper at that time would interfere with his investigation, and the first publication was therefore held up."

He again called early in January, 1916, and he says that Mr. Moore then read to him an editorial which had been prepared, and that thereafter, from time to time, he discussed with him and Mr. Leppert the matters contained in the articles which were subsequently published. In the meanwhile he visited and inspected the Jackson asylum several times, and attended a conference, held in Baton Rouge, later in January at which were present the Governor, as ex officio president of the board of administrators of that asylum; all the administrators save one; the superintendent; Mr. Moore; and himself; the purpose being to hear what Mr. Moore proposed to publish, to afford the administrators and the superintendent an opportunity to be heard, and to determine, or, at least, to have Mr. Moore determine, whether the publication should be made. The conference lasted the greater part of a day; Mr. Moore stated, from notes, the substance of the various charges which were subsequently published, as has been stated. Dr. Herring, examined, under commission, as a witness in this case, testified that he visited the asylum several times between January 1 and 15, 1916, at the request of the medical director of the National Commiteee on Mental Hygiene and made subsequent visits at the request of the Governor of this state, and that he made a written report; from which tes-

timony and report we make the following excerpts:

"I made a very careful inspection of the entire institution, as well as of the farm colony, going through the institution both during the day and at night, and examined carefully the methods employed in treating the patients, and also studied the business methods used at the hospital. * * * The scope of my investigation was entirely sufficient to enable me to obtain a comprehensive view of the institution. * * *

"While the report is brief, as it is intended to be, I am sure that it does not conceal or fail to state anything that I saw during my visits; that is, anything that I considered worthy of comment and of sufficient importance to embrace in a brief report. There was absolutely no intention to conceal anything which I saw, and the report is perfectly truthful and honest. * * * I will say, in a general way, embracing all of the items which I have mentioned, that the East Louisiana Hospital for the insane compares favorably with the best of the institutions in the country and in a great many ways far exceeds similar institutions, especially those in the South. * * * I could not fail to notice in going through the institution that improvements had been made which were in every way beneficial to the patients, for example [and he proceeds to mention some of the very many improvements which had been made]."

From his report to the board of administrators we make the following excerpts:

"The first and strongest impression of the hospital is the freedom, comfort, and cleanliness of the majority of the patients. There is a class of patients who must, of necessity, be more closely confined than others, and there is another class who are destructive and untidy. Special accommodations must be had for these two groups. The small amount of restraint and seclusion among 1,600 patients is really remarkable. I am thoroughly convinced, after a careful study of conditions here, that the patients are kindly and humanely treated in every way, both by the doctors and nurses. That accidents, injuries, and such like occur is quite likely, as they occur in every large hospital for insane or any other large institution, but from a careful examination of the patients the number of such occurrences is very limited.

"I was especially impressed with the sanitary condition of the wards; the floors are clean, the beds and bedding well kept. The lavatories, with cement floors and walls and modern plumbing, are satisfactory in every respect. The dormitories in the building, for negroes especially, struck me as being free from odor, and clean and neat in appearance. The lack of restraint among the negroes is rather unusual, due to the fact that a large number of these patients are employed.

"The farm colony and the building for the criminal insane, in my humble judgment, are ideal in every respect. The central kitchen and dining rooms, the laundry, power plant, and storerooms show every evidence of careful management and constant vigilance in their conduct. The receiving wards for the reception of new patients and the hospital wards for the sick are features which are not found in every institution, and their presence here indicates that the medical staff is keeping abreast with the many advances in mental medicine. I might mention many more instances which indicate a constant and intelligent supervision of the affairs of this hospital, but these must suffice.

"Recommendations: I hesitate to make any suggestions after these two visits for the reason that my trip to your state is for the purpose of making a careful study of all the institutions where the mentally afflicted are confined, and to present a plan which is broad and comprehensive in its scope, and which has for its basic principle the good of the insane and feeble-minded in the entire state. There are, however, a few things. * * * You gentlemen know them, and it is only for the want of money that they have not been installed: First. Painting, plastering, and general repairs on the main building. Second. Additional accommodations for the negro patients. Third. Additional fire escapes and installation of more fire extinguishers. I would suggest the use of the Pyrene fire extinguisher. Fourth. The extension of industry in the wards, especially on the woman's side; if practicable, the employment of a special teacher in different occupations, whose time would be devoted to developing the industries and recreation of the patients."

Concerning the effect upon himself of the publication here complained of, Dr. Pierson testifies as follows:

"Q. Dr. Pierson, you have been asked by Mr. Lemle whether any of your friends have cut you, whether any lodges have dismissed you,

and all of that is offered, of course, to show that you suffered no loss of any sort in regard to the matter. What have you to say on that general question? * * * A. Words would not express the amount of anguish and mortification I have suffered since the publication of these articles. * * * I have suffered more than words can tell you; more than courts can write."

It is true that, after the conference, in January, at which the Governor heard Dr. Pierson and the administrators, in answer to the ex parte charges with which his ears had been filled by Mr. Leppert, he appears to have taken no further interest in that gentleman's investigation; and it is also true that Dr. Pierson has been sustained as against those charges by the administrators, with whom he had been associated for 10 years or more, and that in 1917 when this case was tried (and long afterwards, we may say), he was still the honored superintendent of the asylum, and that neither Mr. Leppert, nor Mr. Leppert with the power and support of the defendant, had succeeded in driving him from his position, or preventing his making a living in Jackson. But there are probably some thousands of people who have read the articles in the Times-Picayune, and the publications appearing in that journal during the trials of this case in the district court, who know nothing more about Dr. Pierson, and perhaps will never know anything more than those articles and publications conveyed, who will never hear of any vindication that he has received, or may receive, and who, if he is recalled to their memories, will be likely to think of him merely as a doctor against whom some ugly charges were brought, and about which he was, for several years, involved in litigation.

Counsel for defendant say in their brief:

"Newspapers ordinarily are run by private corporations for a profit, and no board of directors will permit its manager to publish articles which may subject the company to the payment of a large sum in damages, if the courts should conclude that the articles are not privileged.

"To say that there is a line beyond which the privilege of the press cannot go, and that if it accidentally does so large damages will be awarded against it, will result, in our opinion, in the courts doing, indirectly, what the Bill of Rights in the Constitution of the state says shall not be done, namely: 'No law shall ever be passed to curtail or restrain the liberty of speech or of the press.'"

[1] We are unable to sympathize very deeply with the directors referred to in the paragraph first above quoted, and, all things considered, are of opinion that it would be wiser and more in consonance with such legal and equitable principles as we are acquainted with if they should *not* permit the manager of their profit-seeking corporations to publish articles which may subject them to the payment of large sums in damages, in the event of its being held by the courts that the articles constitute an abuse of, or are not at all within, such privilege as the corporations described may possess; it being well established in the jurisprudence of this court that (quoting from a syllabus):

"A newspaper has no greater privilege than an ordinary person to publish false and defamatory statements." Luzenberg v. O'Malley, 116 La. 700, 41 South. 41.

Nor are we able to agree with the learned counsel in their interpretation of that article of the Bill of Rights in our Constitution, which concerns the freedom of speech and of the press. As we read that article, it is to be interpreted, not only with reference to the language which has been quoted, but as a whole, with special emphasis, it may be said, upon the language which follows that quotation in the same sentence; and which reads:

"Any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

Whilst, therefore, the article prohibits the passage of any law "to curtail or restrain the liberty of speech or of the press," it in

the same sentence imposes the condition that the individual or the press may be held responsible for the abuse of the privilege 'so secured; and it is also well settled that the publication of a libel is such an abuse.

In Fitzpatrick v. Publishing Co., 48 La. Ann. 1131, 20 South. 179, this court quotes with approval from Cooley on Constitutional Limitations the following summary of the law of privilege, with respect to newspapers, to wit:

"The question, however, is not new, and the authorities have generally held the publisher of a paper to the same rigid responsibility with any other person who makes injurious communications. Malice on his part is conclusively inferred if the communications are false."

And from Perret v. New Orleans Times Newspaper, 25 La. Ann. 170 (48 La. Ann. 1134, 20 South. 180):

"We regard the doctrine as no longer controverted, that the publication of any communication * * * which is defamatory and false subjects the publisher, as well as the author, to ,damages in favor of the party aggrieved. Circumstances may be shown in mitigation of damages. The law looks to the animus of the publisher in permitting his columns to be used as a vehicle for the dissemination of calumny, whereby the fair character of an individual may be blasted and his business prospects ruined. * * * The law imputes malice in the publisher from the act of publishing the libel, not malice in the sense of spite, antipathy, or hatred toward the party assailed, but the evil disposition, the malus animus which induced him wantonly or negligently, in disregard of the rights of others to aid the slanderer in his work of defamation by the potent energy of the public press; written or printed slander being considered as more pernicious than that uttered by words only."

And after some further citation of authority the opinion of the court proceeds (48 La. Ann. 1135, 20 South. 181):

"But every publisher is therefore liable, not only for the estimated damages to credit and reputation and such special damages as may *appear*, but also such damages * * * as must * * * be *inferred* from such libel, published in a newspaper of large circulation and position of influence."

A definition of libel, taken by the court from Odgers on Libel and Slander, 720, reads:

"A libel is any publication, whether in writing, printing, picture, effigy or other fixed representation to the eye which exposes a person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

[4] We are of opinion that the publications here complained are well within that definition.

It is understood that plaintiff's combined occupations were those of a superintendent and physician in chief of a state asylum for the insane; that he thereby earned a livelihood for himself and family; had earned the respect of the community; and that his good reputation would probably have served him well in the matter of retaining his position or of succeeding in his profession in the event of his return to the general practice.

The opening announcement, in the first of defendant's publications contains the following statement, under the subheading, "No Thought of Scandal," to wit:

"It is no pleasing task to expose official incompetency and worse. Such however is a duty necessary to a public journal. and, as a duty, it cannot be shirked.

"Without malice and with a view solely of improving conditions for the insane and feebleminded of Louisiana, and to safeguard the interests of the taxpayers, the Times-Picayune voices calmly formed and dispassionate decision that Dr. Clarence Pierson, head of the hospital for the insane at Jackson, is unfit to remain the head of that institution.

"The decision is reached after a searching investigation covering nearly three months, and is based on facts traced directly to him. When the inquiry was begun, its scope, in no wise, embraced official wrongdoing. Scandal was not the aim. Crookedness on the part of officials high or low, was not included when first the investigation was planned or when it had measurably progressed. The work was mapped out

on broader, nobler, lines—on lines bounded solely by betterments to the state's most appealing and most neglected wards—the mentally afflicted."

Plaintiff is charged in the article thus referred to, or in others which followed, with blocking the investigation into conditions existing at the asylum, by the adoption of "canny and cunning evasions and adroitness," thereby arousing and kindling into flame a suspicion of something akin to "rottenness in Denmark" and of "great wrong to the state and her unfortunate wards;" with being "at heart, cruel, callous, inhumane by temperament, and unfitted to hold an office wherein kindliness, respect for conventional decencies and consideration for the rights and welfare of his patients are prime essentials"; with "disregard of professional ethics, neglect of his patients"; and many other acts and omissions which have heretofore been considered, and others which, after being considered, we have thought it not worth while to mention, in view of the extreme length of this opinion.

As we have already stated, the alleged "inquiry" having been completed when the foregoing announcement and the various charges were published, the plain inference therefrom is that the "suspected" "rottenness" and the unsuspected "graft," "scandal," and "crookedness" had been discovered; and the plain statement is that it had all been traced to the plaintiff.

As to the motive by which the author was inspired, we find from his own assertions, shown to have been made at the inception of his investigation, that the quoted statement is false and its hypocrisy unspeakable, and that the charges mentioned were false and malicious, as were most of those which are not mentioned.

The record does not authorize the same finding as to the motive of Mr. Moore, defendant's editor and manager, but in our opinion he was recklessly incautious, and indifferent to the consequences to plaintiff, in publishing the matter sent in by Mr. Leppert, especially as he was afforded the opportunity of hearing the opinions of men of long experience in such matters, one of whom, at least, was an expert and entirely disinterested.

[2] Recurring to the contention of defendant's counsel, in which they have persisted, from the beginning of this litigation, to the effect, as we interpret it, that an undisputed fact, severed from all connected and explanatory circumstances, may be published with impunity, for the purpose of affecting the reputation of a named person, alive or dead, we are of opinion that it is equally unfounded in law and morals, and, if sustained, would justify the publication of the bare statement that such person had killed his mother, though that misfortune had resulted from his falling upon her from a house top, and he had thereby lost his own life. According to our view, whether the statement of a fact be true or false may depend upon the connection in, and purpose for, which it is made. A person may be the agent of another solely for the payment of a debt, but if he should make the statement (literally true) that he is the agent of such other, with the purpose and effect of creating the impression that he is authorized to collect as well as pay and should collect $1,000, his statement considered with reference to its purpose and effect, would not be distinguishable, either in law or morals, from a lie.

It is argued that the amount awarded plaintiff is excessive and unprecedented, and we are asked to reduce it to a nominal sum or, at least, to an amount far below that awarded. But the case is also unprecedented in our experience. The attack upon plaintiff was intended to destroy his reputation, drive him from his occupation, and prevent him from earning a livelihood in Jack-

son, and, though unsuccessful to the extent intended, it inflicted a wound from which he has suffered for 5 years, and is likely to suffer for years to come; in fact, the injury can never be entirely repaired, since, of those who read the extravagantly displayed libels, published day by day for eight days, comparatively few will ever hear of this judgment, and, of the few, very likely many will doubt its correctness and adhere to their opinion as predicated on the libels.

Moreover, defendant has shown nothing that can be considered in palliation of the attack, but, to the contrary, has aggravated the original wrong by a wholesale affirmance of the truth of its false and libelous statements, including the general and reiterated statement that plaintiff was responsible for all the acts and conditions charged, though its investigator was bound to have known, and did know, that as a matter both of fact and law many of them were entirely beyond plaintiff's control; that with respect to others the proper remedies had been applied long before the investigation began; and with respect to still others that such remedies were being applied, and that no good purpose could be accomplished by the suppression of these facts.

The writer and Mr. Justice SOMMER-VILLE are therefore of opinion that the judgment appealed from (awarding plaintiff $7,500) might well be affirmed; but, as Mr. Justice O'NIELL dissents, and Justices PROVOSTY and DAWKINS are of opinion that the amount awarded should be reduced to $2,000, the conclusion has been reached by the concurring members of the court that the interests of justice and of the plaintiff will be best subserved by awarding the amount last above mentioned, $2,000.

It is therefore adjudged and decreed that the judgment appealed from be amended by reducing the amount of the award to $2,000,

and by condemning the plaintiff to pay the costs of the appeal, and otherwise affirmed.

PROVOSTY, J., concurs in the decree and hands down concurring opinion. See 88 South. 116.

O'NIELL, J., dissents and hands down reasons. See 88 South. 113.

DAWKINS, J., concurs in the decree only.